Sarah B. SHIELDS, on behalf of herself and all others similarly situated

v.

AMOSKEAG BANK SHARES, INC.; Amoskeag Bank; James U. Edwards, III; James S. Yakovakis; Peter J. Allen; Milton Machinist; Edward L. Allman; Raymond B. Woolson; John L. Allen; Howard W. Keegan; William S. Bushnell.

Nishan SERABIAN, on behalf of himself and all others similarly situated

v.

AMOSKEAG BANK SHARES, INC.; Amoskeag Bank; James U. Edwards, III; James S. Yakovakis; Peter J. Allen; Milton Machinist; Edward L. Allman; Raymond B. Woolson; John L. Allen; Howard W. Keegan; William S. Bushnell.

Emilio LO PRIORE, Lena Lo Priore, on behalf of themselves and all others similarly situated

v.

AMOSKEAG BANK SHARES, INC.; Amoskeag Bank; James U. Edwards, III; James S. Yakovakis; Peter J. Allen; Milton Machinist; Edward L. Allman; Raymond B. Woolson; John L. Allen; Howard W. Keegan; William S. Bushnell.

Civ. Nos. 90–83–D, 90–85–D, 90–86–D.

United States District Court, D. New Hampshire.

May 17, 1991.

Greenfield & Chimicles by Richard D. Greenfield, Francis J. Farina, Haverford, Pa., Berman, Devalerio & Pease by Peter Pease, Boston, Mass., Levin, Fishbein, Sedran & Berman by Arnold Levin, Philadelphia, Pa., Bouchard & Mallory, P.A., by

Mark L. Mallory, Manchester, N.H., for plaintiffs.

Dilworth, Paxson, Kalish & Kauffman by David H. Pittinsky, Lawrence D. Berger, Philadelphia, Pa., Upton, Sanders & Smith by Frederic K. Upton, Robert Upton, II, Concord, N.H., Devine, Millimet, Stahl & Branch, by E. Donald Dufresne, Manchester, N.H., for defendants.

## ORDER

DEVINE, Chief Judge.

The above-captioned cases are representative of a host of securities fraud lawsuits filed in federal district courts against New England banks as a result of the woefully deteriorating real estate markets and recessionary economic conditions in the Northeast. Plaintiffs bring these actions seeking damages incurred as a result of defendants' alleged violations of the Securities Exchange Act of 1934 §§ 10(b), 20; and its attendant regulation, Rule 10b–5, 17 C.F.R. § 240.10–b. Prior to the transfer of these cases from the Eastern District of Pennsylvania to this court, the parties stipulated to the filing of a "Revised Second Consolidated Amended Complaint", which the court treats and refers to as the complaint for all three cases presently before it. Jurisdiction is founded on the Securities Exchange Act of 1934, 15 U.S.C. § 78aa. Now before the court are defendants' motions to dismiss.

### Background

Amoskeag Bank Shares ("Bank Shares") is a New Hampshire bank holding corporation with four wholly owned subsidiaries: Amoskeag Bank, New Hampshire's largest bank; Nashua Trust Company; Bank Meridian, N.A.; and Souhegan National Bank of Milford. The nine individual defendants [1] are senior officers and/or directors of the corporation or Amoskeag Bank.

Plaintiffs claim that the defendants were responsible for issuing certain documents, reports, and statements that were material-

---

1. The individual defendants are: John L. Allen, Milton Machinist, Howard W. Keegan, Edward L. Allman, Peter J. Allen, James S. Yakovakis, James U. Edwards, Raymond B. Woolson, and William S. Bushnell.

ly false, misleading, and made without a reasonable basis. Plaintiffs assert that these statements, disseminated to the investing public and security holders starting on May 1, 1987, and continuing through October 23, 1989 (the "class period"),[2] artificially inflated the price of Bank Shares stock. Some of those statements, as presented in the complaint, are detailed below.

On May 11, 1987, a Proxy Statement was sent to holders of Nashua Trust Corporation common stock pursuant to Nashua's merger agreement with Bank Shares. In pertinent part, the statement reported a shift in its loan portfolio and source of funds from residential to more commercial real estate loans. "Much of the shift in the loan portfolio has been to improve the yield structure of the balance sheet." Complaint ¶ 20. The Proxy Statement also stated,

> During the past two years, Amoskeag Bank has extended its commercial real estate lending activities from primarily southern New Hampshire to the rest of the Northeast as well as other states. The objectives of the increased emphasis on commercial lending are (1) to generate greater interest income; (2) to restructure the loan portfolio with shorter maturities and or adjustable rates; and (3) to increase loan and other fee income from the origination, packaging, sale and servicing of loans and participations.

*Id.* at 10. Specifically with respect to Amoskeag Bank's loan loss reserves,[3] the Proxy Statement reported,

> The provision for loan losses in 1986 was $3.6 million, $2.0 million higher than in 1985. The increased provision reflects loan growth and management's desire to increase the allowance for loan losses as a percentage of loans outstanding. Net charge-offs totaled .11% of average loans for 1986 compared to .08% for 1985. At year-end 1986, the allowance to loan ratio was .62% compared to .52% at the previous year-end. Non-performing loans and other real estate owned were $2.7 million or .24% of loans at year-end compared to $2.6 million or .29% of loans at year-end 1985.

*Id.* at 14–15. Subsequent to the merger, throughout the second half of 1988 it was reported that Bank Shares made substantial additions to its provision for loan losses in an effort to "safeguard against an extended slow down in real estate and condominium markets." *Id.* at ¶¶ 26–28. Defendants explained their response to such "uncertainties in the loan portfolio" as being "[c]onsistent with past practice of the company to address issues in a timely and conservative manner. We strongly believe this action will ensure the integrity of our financial statements and solidify the foundation for future earnings gains. . . ." *Id.* at ¶ 27. According to plaintiffs, this "rosy view" of the corporation's financial health was also presented in its 1988 Annual Report. The Report acknowledged problems with its real-estate-related loans, but explained the situation as follows:

> We view these developments as both short-term and long-run in nature. In the near-term, lagging sales created a temporary excess in real estate inventory that is in the process of being reduced. The economic outlook for New Hampshire continues to reflect growth statistics which augur well for the correction to occur. For the long-term, we see the signals of a shift to business growth

---

**2.** Plaintiffs' complaint alleges that they bring this securities fraud case as a class action pursuant to Rules 23(a) and 23(b)(3), Fed.R.Civ.P., on behalf of "all purchasers of Bank Shares publicly traded securities during the period of May 1, 1987 through and including Oct. 23, 1989." Complaint ¶ 9.

**3.** Nearly all banks have an important "valuation" reserve, labeled *reserve for loan losses* or some similar term. The reserve exists because the federal income tax law permits the banks to deduct annually from taxable income a provision for very large possible future loan losses. Because of the tax deduction, the loss reserve is increased by about twice as much as the *net* amount deducted from earnings. When loans go bad, the loan account and the loss reserve are reduced; if something is recovered on a bad loan, the loan account and the reserve are equally restored. . . .
G. Christy, *Introduction to Investments* at 421 (6th ed. 1974).

rather than real estate development as the state's economic engine.

For Amoskeag in 1988, this shift in our environment inspired significant actions. At year end, nonaccrual—primarily real estate-related—loans had risen to $35.8 million. *We believe we are generally well secured in marketable properties with good underlying values.* During 1988, total provisions to the allowance for loan and lease losses were $12.9 million, while net charge-offs totaled $4.7 million. At the end of 1988, the final allowance for loan and lease losses totaled $19.1 million, compared to $10.9 million a year earlier. The allowance for loan and lease losses has been raised to 1.06% of total loans at the end of 1988 from .67% at the close of 1987—*a prudent and proper course for today.*

*Id.* at ¶ 29 (emphasis in complaint).

Plaintiffs contend that these statements gave investors a false sense of security and caused the price of Bank Shares' stock to be artificially inflated. As evidence of Bank Shares' true financial status, plaintiffs point to an April 14, 1989, news release in which the company addressed how it was controlling and monitoring the continued deterioration of Bank Shares' loan portfolio and its asset and liability yields. Specifically, Bank Shares stated,

> In response we have increased the provision for loan and lease losses to a level we believe is sufficient for the present condition of our loan portfolio. The level of non-performing loans has shown a dramatic increase from the prior year first quarter. It is important to note that there is underlying real estate collateral for nearly all of these loans.
>
> We believe the level of the allowance for loan and lease losses adequately supports the risk of these loans in today's economic environment. However, if further deterioration is experienced, we will make appropriate increases to our provision for loan and lease losses in future quarters as conditions warrant.

*Id.* at ¶ 32. As a result of this announcement, Bank Shares stock fell from 11½ per share on April 12, 1989, to 9⅞ per share on April 17, 1989. Plaintiffs further point to Amoskeag's decision to defer filing its Form 10–Q for the quarter ending March 31, 1989. On May 16, 1989, Bank Shares reported that the deferral was intended to allow management to re-examine the adequacy of the allowance for loan and lease losses in light of the "deterioration in the condition of certain previously identified problem loans, which was confirmed during a routine examination of Amoskeag Bank by the federal and state examiners which was completed on May 11, 1989." *Id.* at ¶ 34. After this May 16, 1989, announcement, Bank Shares stock fell an additional $1.50 per share from its closing price on April 17, 1989. Plaintiffs contend that instead of disclosing these problems to investors and making adequate additions to loan loss reserves during the class period, defendants issued misleading explanations to prolong the illusion of continued growth and profitability.

In May 1989 Bank Shares announced an additional $31.5 million loan loss provision over and above the $6.1 million previously announced for the first quarter of 1989. On October 23, 1989, the end of the class period, Amoskeag reported a net loss of $18 million and a total allowance for loan losses of $49 million for the third quarter of fiscal year 1989.[4]

Defendants move to dismiss the complaint for failure to state a claim. *See* Rule 12(b)(6), Fed.R.Civ.P. In ruling on such a motion, the court follows the well-established requirement that the material facts alleged in the complaint are to be construed in the light most favorable to the plaintiff and taken as admitted, with dismissal to be ordered only if the plaintiff is not entitled to relief under any set of facts he could prove. *Batchelder v. Northern Fire Lites, Inc.*, 630 F.Supp. 1115, 1121 (D.N.H.1986). *See also Scheuer v. Rhodes*, 416 U.S. 232, 236, 94 S.Ct. 1683, 1686, 40 L.Ed.2d 90 (1974); *Conley v. Gibson*, 355 U.S. 41, 45–

---

**4.** The Form 10–Q filed for the third quarter of 1989 that ended September 30, 1989, reported these same figures at $17.9 million and $48.5 million, respectively. Complaint ¶ 38.

46, 78 S.Ct. 99, 101–02, 2 L.Ed.2d 80 (1957). The facts of the complaint are taken as admitted, and the complaint can be dismissed only if it appears beyond doubt that plaintiff can prove no set of facts which would entitle him to relief. *Lessler v. Little,* 857 F.2d 866, 867 (1st Cir.1988), *cert. denied,* 489 U.S. 1016, 109 S.Ct. 1130, 103 L.Ed.2d 192 (1989); *Conley, supra,* 355 U.S. at 45–46, 78 S.Ct. at 101–02.

To state a claim under section 10(b) and Rule 10b–5, the factual allegations in the complaint must indicate that (1) defendants misrepresented or omitted material facts in connection with the purchase and sale of a security; (2) plaintiffs relied on such misrepresentation or omission to their detriment; and (3) defendants made the misrepresentation or omission with scienter. *See* 15 U.S.C. § 78j(b);[5] 17 C.F.R. § 240.10b–5.[6] *See also Ernst & Ernst v. Hochfelder,* 425 U.S. 185, 96 S.Ct. 1375, 47 L.Ed.2d 668 (1976); *Blue Chip Stamps v. Manor Drug Store,* 421 U.S. 723, 95 S.Ct. 1917, 44 L.Ed.2d 539 (1975); *Ballan v. Wilfred Am. Educ. Corp.,* 720 F.Supp. 241, 247 (E.D.N.Y.1989).

In support of their motions to dismiss, defendants make several arguments; each will be discussed *seriatim.*

### a. Disclosure

■ Defendant Bank Shares first contends that plaintiff cannot state a claim under Rule 10b–5 for failure to disclose information where it appears on the face of the complaint and the documents alleged to be misleading that some of the information was in fact disclosed. Specifically, defendant contends that, despite plaintiffs' allegations to the contrary, its May 11, 1987, Proxy Statement disclosed (1) the growth in its commercial loans; (2) the fact that it was lending outside southern New Hampshire; and (3) the large increase in provisions for loan losses. *See* Complaint ¶ 23. Plaintiffs do not and cannot refute the fact that this information was disclosed. However, they contend that this narrow argument misses the thrust of the complaint, which is that the true financial condition of Bank Shares, specifically with respect to its problem loans and loan loss reserves, was materially misrepresented and only revealed to the public when it was forced to be truthful by the deteriorated status of their problem loans and federal and state regulatory authorities. Under these circumstances, dismissal of plaintiffs' entire claim on this ground would be improper.

### b. Corporate Mismanagement

■ Bank Shares next argues that plaintiffs have only pled a common-law case of corporate mismanagement and that the failure to disclose mismanagement is not actionable under Rule 10b–5.

It is well established that allegations of "corporate mismanagement alone are not sufficient to implicate Rule 10b–5," and that there is a further requirement of deception in the management. *Santa Fe Industries, Inc. v. Green,* 430 U.S. 462, 476, 97 S.Ct. 1292, 1302, 51 L.Ed.2d 480 (1977); *Batchelder v. Northern Fire Lites Inc.,*

---

**5.** 15 U.S.C. § 78j(b) provides:

It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce or of the mails, or of the facility of any national securities exchange—

....

(b) to use or employ, in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered, any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors.

**6.** 17 C.F.R. § 240.10b–5 provides:

It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange,

(a) To employ any device, scheme, or artifice to defraud,

(b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading,

(c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security.

*supra,* 630 F.Supp. at 1121. However, "[t]he line between a material nondisclosure and the nondisclosure of mere mismanagement is often difficult to draw. Arguably, any action amounting to corporate mismanagement would be material; that is, substantially likely to assume significance in the decisionmaking of the reasonable investor." *Craftmatic Securities Litigation v. Kraftsow,* 890 F.2d 628, 639 (3d Cir.1989).

■ Bank Shares contends that the gravamen of the complaint, Complaint ¶ 47, merely alleges that defendants failed to discover, acknowledge, and disclose their own incompetence. Paragraph 47 alleges the following:

47. During the Class Period, the defendants, individually and in concert, together with the other members of Bank Shares' and Amoskeag's Boards of Directors, directly and indirectly, engaged and participated in or aided and abetted a continuous course of conduct and conspiracy to conceal adverse material information regarding the finances, financial condition and future prospects of the Company as specified herein. Defendants employed devices, schemes, and artifices to defraud and engaged in acts, practices, and a course of conduct as hereinafter alleged in an effort to maintain artificially high market prices for the securities of Bank Shares prior and subsequent to the Merger. This included the formulation, making of and/or participation in the making of untrue statements of material facts and omitting to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, and engaging in acts, practices and courses of business which operated as a fraud and deceit upon plaintiffs and the classes. These included, among other things, the following:

a. That BankShares' total loan loss reserves were not maintained at an adequate level in light of the economic conditions prevailing in certain areas of loan concentration and the concomitant high risk of noncollectability of a large portion of Bank Shares' commercial real estate and other loans, which facts were known and/or foreseeable by the individual defendants;

b. That with respect to these loans, Bank Shares' credit review and authorization standards and policies and system of internal controls to assure adequate collateralization and prompt recognition and accounting for problem loans were not functioning adequately or were being disregarded, not followed or circumvented by senior officers of the Company in order to maintain artificially high loan and earnings growth;

c. That Bank Shares' lending practices and controls were not sufficiently centralized, were unmanageable and that Bank Shares' commercial lending officers had engaged in high-risk and speculative loan transactions which were not being adequately supervised, controlled, or directed by higher management;

d. That Bank Shares' management was inadequate to supervise and control properly the lending activities in which Bank Shares and its subsidiaries had engaged, particularly those to real estate developers and commercial customers;

e. That the earnings, assets, and net worth of Bank Shares were improperly and materially overstated and inflated throughout the Class Period by an amount in excess of at least $80 million due to grossly inadequate provisions for loan losses;

f. That the defendants caused Bank Shares to continually understate its nonperforming loans and failed to provide adequate loan loss reserves for problem loans promptly and properly, and instead granted extensions, further credits, and other beneficial terms to its problem loan customers in order to postpone improperly the recognition of said problem loans in the publicly disseminated financial statements of Bank Shares;

g. That Bank Shares would be required to add at least $80 million to its allowance for loan losses as a result of its lending practices; and

h. That a regulatory review was underway at the time of Bank Shares April 14, 1989 announcement, the existence of which was not made public until May 15, 1989, and the full extent of which was not known until February 2, 1990.

Most courts recently faced with strikingly similar complaints have concluded that these allegations amount to corporate mismanagement and poor business judgment in coping with the general economic downturn, rather than fraud. *See, e.g., DiLeo v. Ernst & Young*, 901 F.2d 624, 626–27 (7th Cir.), *cert. denied*, —— U.S. ——, 111 S.Ct. 347, 112 L.Ed.2d 312 (1990); *Wilkes v. Heritage Bankcorp*, 767 F.Supp. 1166 (D.Mass. 1991); *Driscoll v. Landmark Bank for Savings*, 758 F.Supp. 48 (D.Mass.1991); *Haft v. Eastland*, 755 F.Supp. 1123 (D.R.I. 1991); *Gollomp v. MNC Financial, Inc.*, 756 F.Supp. 228 (D.Md.1991); *Akerman v. Bankworcester Corp.*, 751 F.Supp. 11 (D.Mass.1990); *Loan v. FDIC*, 717 F.Supp. 964, 967 (D.Mass.1989). *But see Save–On–Surplus v. United Saver's Bancorp*, 760 F.Supp. 971 (D.N.H.1990); *Akerman v. Amoskeag Bank Shares*, 90–119–D (N.H.), 90–539B (R.I.) (D.N.H. May 9, 1990). Indeed, since this court's rulings in *Save–On–Surplus* and *Akerman*, a flood of securities fraud class action suits have been filed in federal district courts within this circuit. Upon examining similar complaints before them, courts found allegations such as those set out in ¶ 47 of this complaint so general that they could be filed against any financial institution in New England. The court agrees with the wisdom of the majority and finds that the allegations in ¶ 47, without more, do not amount to "fraud".

#### c. Rule 9(b)

■ All defendants also move to dismiss this action for failure to plead fraud with particularity. Rule 9(b), Fed.R.Civ.P., provides:

Fraud, Mistake, Condition of the Mind. In all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity. Malice, intent, knowledge, and other condition of mind of a person may be averred generally.

Rule 9(b) requires "specification of the time, place, and content of an alleged false representation, but not the circumstances or evidence from which fraudulent intent could be inferred." *Hayduk v. Lanna*, 775 F.2d 441, 444 (1st Cir.1985); *McGinty v. Beranger Volkswagen, Inc.*, 633 F.2d 226, 228 (1st Cir.1980); *Wayne Investment v. Gulf Oil Corp.*, 739 F.2d 11, 13–14 (1st Cir.1984). Allegations in the form of mere conclusions, accusations, or speculation are not sufficient to meet Rule 9(b)'s particularity requirement without supporting facts surrounding the scheme to defraud or a basis for believing such a scheme existed. *See, id.* at 14 ("purely speculative allegations of fraud are not sufficient under Rule 9(b)"); *see also Romani v. Shearson Lehman*, 929 F.2d 875 (1st Cir.1991) (where plaintiff failed to allege in some detail the facts and figures upon which the claims of misrepresentation are based, his complaint was insufficient under Rule 9(b)); *Decker v. Massey Ferguson, Ltd.*, 681 F.2d 111, 114 (2d Cir.1982) ("conclusory allegations that defendant's conduct was fraudulent or deceptive are not enough"); *Dileo v. Ernst & Young, supra*, 901 F.2d at 627 (Rule 9(b) requires the "circumstances" constituting fraud to be pled in detail; this means "the who, what, when, where and how"); *Wilkes v. Heritage Bankcorp, Inc., supra*, slip op. at 13 (repeated, rephrased, and conclusory allegations of federal securities law violations without specifics did not satisfy Rule 9(b)); *Driscoll v. Landmark Bank for Savings, supra*, 758 F.Supp. at 52 ("a complaint must make some step toward explaining how and why the statements made by the defendants were false and misleading when made"); *Haft v. Eastland Financial Corp., supra*, 755 F.Supp. at 1127–28 (plaintiff's complaint must convey "some sense of how they came to believe that fraud was at the heart of their loss" by explaining how each of the challenged statements was untrue); *Akerman v. Bankworcester Corp., supra*, 751 F.Supp. at 12 ("conclusory statements that pertain more to mismanagement than to misrepresentations" do not satisfy Rule

9(b)); *Loan v. FDIC, supra,* 717 F.Supp. at 967 ("plaintiff has an obligation to explain what is untrue about each of the challenged statements and cannot quote a statement and assert that it is untrue"); *Konstantinakos v. FDIC,* 719 F.Supp. 35, 38–39 n. 7 (D.Mass.1989) (complaint's failure to explain how the challenged statements were misleading runs afoul of Rule 9(b)); *but see Save–on–Surplus v. United Saver's Bancorp, supra* (Rule 9(b) requires no more than "time, place and content" of the misrepresentation).

Generally there are three purposes behind Rule 9(b)'s particularity requirement: "(1) to place defendants on notice and enable them to prepare meaningful responses; (2) to preclude the use of a groundless fraud claim as a pretext to discovering a wrong or as a 'strike suit';[7] and (3) to safeguard defendants from frivolous charges which might damage their reputations." *New England Data Services, Inc. v. Becher,* 829 F.2d 286, 289 (1st Cir.1987).

In the context of securities litigation, the First Circuit has applied Rule 9(b) strictly for fear that "a plaintiff with a largely groundless claim will bring suit and conduct extensive discovery in the hopes that the process will reveal relevant evidence." *Id.* at 288; *see also Romani, supra,* 929 F.2d at 878–79; *Wayne, supra,* 739 F.2d at 13; *Hayduk, supra,* 775 F.2d at 443. In reviewing a 10b–5 complaint, this court must therefore carefully balance the "particularity" requirements and the purposes for Rule 9(b) as articulated by the First Circuit. This is, necessarily, a fact-oriented determination.

The fact that another complaint filed in a related case was found to satisfy the requirements of Rule 9(b) does not help these plaintiffs. *Cf. Akerman v. Amoskeag Bank Shares,* formerly No. 90–119–L. Each complaint must stand or fall on what is contained within its own four corners. To hold otherwise would circumvent Rules 8 and 9, which require the complaint to provide notice of a plaintiff's claim and to particularize all allegations of fraud. *See* Rules 8, 9(b), Fed.R.Civ.P.; *Konstantinakos v. FDIC, supra,* 719 F.Supp. at 38 n. 6; *see also Dileo, supra,* 901 F.2d at 627 ("Investors seeking relief under 10b–5 have to distinguish their situation from that of many others who are adversely affected by business reverses.").[8]

In this complaint, plaintiffs quote from a 1987 proxy statement, the company's 1988 Annual Report, and numerous public statements made by Bank Shares throughout the two-and-one-half-year class period. Every statement during the class period announced an increase in the provision for loan loss reserves higher than its predecessor. Yet, the thrust of the complaint is that Bank Shares failed to adequately increase its reserves during the class period in light of the prevailing economic conditions and the high-risk, problem loans in its portfolio. The complaint, however, fails to provide any specific factual basis for believing that a two-and-one-half-year scheme to defraud investors existed. *See Hayduk, supra,* 775 F.2d at 444.

As eloquently stated by the Seventh Circuit in *Dileo,*

The story in this complaint is familiar in securities litigation. At one time the

7. "A 'strike suit' is defined as a derivative action instituted by a minority of stockholders for the purpose of oppressing the majority and involving the corporation itself in disaster for selfish purposes and for reasons not always revealed." 27 A.L.R.Fed. 407, § 6, at n. 6. The First Circuit has refined this definition to include largely groundless suits brought to increase the settlement value of the case. *Wayne, supra,* 739 F.2d at 13; *accord Haft v. Eastland Financial Corp., supra,* at n. 6. The court notes the possibility that these cases may have been brought for their *in terrorem* value.

8. In their objection, plaintiffs make much of the fact that defendants had filed an answer prior to the transfer of this action and therefore have no legal basis for making a Rule 9(b) argument. The court finds this contention meritless. By filing an answer, defendants did not waive their Rule 9(b) defense. Presently before the court are defendants' motions to dismiss for failure to state a claim pursuant to Rule 12(b)(6). Motions to dismiss for failure to satisfy Rule 9(b)'s particularity requirement may properly be characterized as motions to dismiss for failure to state a claim. *See* 5 Wright & Miller, *Federal Practice and Procedure* § 1300.

firm bathes itself in a favorable light. Later the firm discloses that things are less rosy. The plaintiff contends that the difference must be attributable to fraud. "Must be" is the critical phrase, for the complaint offers no information other than the difference between the two statements of the firm's condition. Because only a fraction of financial deteriorations reflects fraud, plaintiffs may not proffer the different financial statements and rest. Investors must point to some facts suggesting that the difference is attributable to fraud.

*Dileo, supra,* at 627.

The inadequacies of this complaint are highlighted when contrasted with the allegations offered by plaintiffs in other factually analogous securities fraud cases. For example, in *Hurley v. FDIC,* 719 F.Supp. 27 (D.Mass.1989), the complaint alleged that a bank's financial reports were fraudulent because they did not take into account numerous problem loans. The complaint contained many details about specific delinquent loans, the bank's net worth, and its reserves for potential loan losses. *Id.* at 31. *See also Wool v. Tandem Computers, Inc.,* 818 F.2d 1433, 1440 (9th Cir.1989) ("The complaint specified the exact dollar amount of each overstatement, and the manner in which such representations were false and misleading."). Plaintiffs' complaint is comparatively devoid of any specific details. In essence, plaintiffs contend that defendants committed fraud based on the company's failure to act as "conservatively" and "prudently" in managing their loans as the financial statements indicated. *See Romani v. Shearson Lehman,* 929 F.2d at 880 ("Were such a pleading deemed sufficient, the advent of a recession could be expected to trigger a multitude of complaints in which plaintiffs seek to impose liability for their financial disappointments based on entirely fabricated scenarios of fraud."). Such speculative allegations do not meet the Rule 9(b) threshold.

Where multiple defendants are involved, each defendant's role in the fraud must be particularized. *See Margaret Hall Foundation v. Atlantic Financial Management, Inc.,* 572 F.Supp. 1475, 1481 (D.Mass.1983). This requirements serves to place each defendant on notice of what role he is alleged to have played in the fraud. *Id.*

As against the nine individual defendants, the complaint in one broad stroke alleges not only the direct Rule 10b–5 claims, but also "control person" liability for the fraudulent actions of Amoskeag, *see* Complaint ¶ 7, and "aider and abettor" liability, *see* Complaint ¶ 49. The complaint repeatedly alleges that "the defendants" engaged in fraudulent conduct without specifying how such named defendants—directors of Bank Shares, senior officers of Amoskeag Bank—and others unnamed but mentioned in the complaint ("all members of Bank Shares' and Amoskeag's Board of Directors, purportedly independent legal counsel and auditors", Complaint ¶¶ 8, 50) participated in the alleged fraud.

Defendants argue that the complaint vaguely alleges both primary and secondary liability for securities fraud and violates Rule 9(b). Plaintiffs respond that all defendants are primarily liable because all participated as a group in publishing the misstatements contained in the Prospectus accompanying the Proxy Statement, registration statements, Form 10–Q, 1988 Annual Report, and press releases.

In support of their theory of group liability, plaintiffs rely on *Wool v. Tandem Computers, Inc.,* 818 F.2d 1433 (9th Cir. 1987). In *Wool,* a stock purchaser brought a securities fraud class action against a corporation and a group of corporate officers who had direct involvement in the day-to-day operation of the corporation and specific involvement in the corporation's financial statements. Finding that plaintiff's complaint against the individual defendants satisfied Rule 9(b), the Ninth Circuit reasoned:

> In cases of corporate fraud where the false or misleading information is conveyed in prospectuses, registration statements, annual reports, press releases, or other "group-published information," it is reasonable to presume that these are the collective actions of the officers. Un-

der such circumstances, a plaintiff fulfills the particularity requirement of Rule 9(b) by pleading the misrepresentations with particularity and where possible the roles of the individual defendants in the misrepresentations.

*Id.* at 1440 (citations omitted).

The First Circuit has not yet recognized this means to satisfy Rule 9(b), and this court refuses to so hold, in light of the deficiencies in the present complaint. *See, e.g., In re Consumers Power Co. Securities Litigation,* 105 F.R.D. 583, 592–93 (E.D.Mich.1985).

At a minimum, the complaint must include the following: (1) the nature of each individual defendant's participation in the fraud; (2) whether the defendant is being sued as a primary defendant or as an aider or abettor;[9] and (3) as to allegations on information and belief, a statement of the source of the information and the reasons upon which the belief is founded. *See Goldberg v. Midor,* 81 F.R.D. 105, 111 (S.D. N.Y.1979). The complaint fails to provide this information as to *any* individual defendant.[10] As it now stands, the complaint fails to place any of the individual defendants on notice about the nature of plaintiffs' claims against them and what role each defendant is alleged to have played in the fraud.

### Conclusion

For the reasons stated herein, defendants' motions to dismiss the Revised Second Consolidated Amended Complaint (documents 10 and 12) are granted. Such complaint is hereby dismissed without prejudice.

---

**9.** To establish aider or abettor liability, a plaintiff must prove:

    (1) the commission of a violation of § 10(b) or rule 10b–5 by the primary party;

    (2) the defendant's general awareness that his role was part of an overall activity that is improper; and

    (3) knowing and substantial assistance of the primary violation by the defendant.

*Cleary v. Perfectune, Inc.,* 700 F.2d 774 (1st Cir. 1983).

This determination of the court renders all other outstanding motions moot.

SO ORDERED.

---

**10.** With the exception of defendants J. Allen and Machinist, the complaint is devoid of any specific reference to the individual defendants. The references to Messrs. J. Allen and Machinist found in paragraphs 27 through 29, 32, and 39 are limited to public statements made by them without specifying the omissions or misstatements regarding them.