USCA1 Opinion

 

 UNITED STATES COURT OF APPEALS FOR THE FIRST CIRCUIT ____________________ No. 93-2070 NISHAN SERABIAN, ET AL., Plaintiffs, Appellants, v. AMOSKEAG BANK SHARES, INC., ET AL., Defendants, Appellees. ____________________ APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF NEW HAMPSHIRE [Hon. Shane Devine, Senior U.S. District Judge] __________________________ ____________________ Before Torruella, Circuit Judge, _____________ Coffin, Senior Circuit Judge, ____________________ and Boudin, Circuit Judge. _____________ ____________________ James R. Malone, Jr., with whom C. Oliver Burt, III, Michael D. _____________________ ____________________ ___________ Gottsch, Pamela Bond and Peter A. Pease were on brief appellants. _______ ___________ ______________ Robert Upton, II, with whom Charles W. Grau was on brief for _________________ ________________ Amoskeag Bank Shares, Inc. Ovide M. Lamontagne with whom E. Donald Dufresne was on brief for ___________________ __________________ Allen, Machinist, Bushnell, Yakovakis, Woolson, Allman and Keegan. ____________________ May 27, 1994 ____________________ COFFIN, Senior Circuit Judge. The question on this appeal _____________________ is whether appellants' Third Amended Complaint states a claim for fraud under federal securities law, see 15 U.S.C. 78j(b) ( ___ 10(b) of the Securities Exchange Act of 1934); SEC Rule 10b-5 (17 C.F.R. 240.10b-5), a claim that must be plead "with particularity." Fed. R. Civ. P. 9(b). The district court held that it did not, and dismissed the complaint with prejudice. After carefully studying the 86-page, 107-paragraph complaint, we have concluded that portions of it are entitled to survive. We therefore vacate the dismissal in part, and remand for further proceedings limited to the actionable allegations. I. Background __________ During the period relevant to this litigation, defendant Amoskeag Bank Shares ("Bank Shares" or "the bank" or "the company") was a New Hampshire bank holding corporation with four wholly owned subsidiaries: Amoskeag Bank, New Hampshire's largest bank; Nashua Trust Company; Bank Meridian, N.A.; and Souhegan National Bank of Milford.1 The seven individual defendants are certain of Bank Shares' former officers and/or directors. Plaintiffs are the purchasers of Bank Shares' common stock. In this lawsuit, filed as a class action but still uncertified, they claim that the defendants issued various documents, reports, and statements that misrepresented and failed to disclose material facts concerning Bank Shares' true financial condition, ____________________ 1 Bank Shares was taken over by the FDIC in October 1991. -2- thereby artificially inflating the market price of the company's stock at the time they purchased it.2 The complaint depicts an increasingly familiar saga of a bank that boomed with the real estate market of the early 1980s, but suffered in the recession and deteriorating market that followed. See, e.g., In Re Wells Fargo Securities Litigation, 12 ___ ____ _______________________________________ F.3d 922 (9th Cir. 1993); In Re Glenfed, Inc. Securities __________________________________ Litigation, 11 F.3d 843 (9th Cir. 1993), reh'ng en banc, granted, __________ _______________________ 11 F.3d 843 (9th Cir. Feb. 25, 1994); Shapiro v. UJB Financial _______ _____________ Corp., 964 F.2d 272 (3d Cir. 1992); DiLeo v. Ernst & Young, 901 _____ _____ _____________ F.2d 624 (7th Cir. 1990). The primary thrust of the allegations is that defendants knew that their loan portfolio contained many high-risk loans, that the reserves for such loans were inadequate,3 and that poor internal controls exacerbated the difficulties, but that they nevertheless continued to paint a rosy picture of the bank's financial circumstances. The district court, having given plaintiffs the opportunity to amend a previous version of the complaint, concluded that, "[a]t most, the [Third Amended] [C]omplaint demonstrates dubious business judgment or mismanagement." The court felt that the pleading, reduced to its essence, alleged that the defendants throughout the relevant period knowingly reserved too little in ____________________ 2 Rule 10b-5, promulgated by the SEC under the authority provided by 10(b) of the Securities Exchange Act, makes it unlawful to misrepresent or omit material information in connection with the purchase or sale of securities. 3 The amount put aside as a protection against loan defaults is known as the ALL -- the "allowance for loan losses." -3- anticipation of loan losses. In the court's view, however, the complaint lacked a basis for inferring the defendants' knowledge of the deficiency and, moreover, failed to identify any specific loans whose reserves were inadequate. These deficiencies, despite ample opportunity for discovery and "considerable ingenuity in pleading," prompted the court to dismiss the complaint with prejudice. Plaintiffs argue on appeal that the complaint more than adequately set forth the bases for their allegations of fraud by detailing numerous specific instances in which the defendants had knowledge of the "true facts," yet made substantially different representations to the investing public. They claim that the district court impermissibly drew inferences in favor of the defendants, contrary to its obligation to indulge every reasonable inference helpful to their case. See, e.g., Garita ___ ____ ______ Hotel Ltd. Partnership v. Ponce Federal Bank, 958 F.2d 15, 17 ______________________ ___________________ (1st Cir. 1992). We review the district court's determination de novo, __ ____ applying the same criteria employed by the district court. Id. ___ If the allegations would permit recovery under any viable theory, the dismissal must be reversed. Id. ___ II. Applicable Standards ____________________ We preface our discussion with a brief survey of the general principles that must guide our review of plaintiffs' complaint. First, the securities laws "do not guarantee sound business practices and do not protect investors against reverses," DiLeo, _____ -4- 901 F.2d at 627. In stating an actionable claim for misrepresentation, therefore, plaintiffs must plead more than that defendants acted irresponsibly and unwisely, but that they were aware that "mismanagement had occurred and made a material public statement about the state of corporate affairs inconsistent with the existence of the mismanagement," Hayes v. _____ Gross, 982 F.2d 104, 106 (3d Cir. 1992). See also Shapiro, 964 _____ ___ ____ _______ F.2d at 283 ("[I]t is not a violation of the securities laws to simply fail to provide adequate loan loss reserves; properly collaterize or secure a loan portfolio; or provide sufficient internal controls or loan management practices."). Second, defendants may not be held liable under the securities laws for accurate reports of past successes, even if present circumstances are less rosy, see Capri Optics Profit ___ ____________________ Sharing v. Digital Equipment, 950 F.2d 5, 7-8 (1st Cir. 1991),4 _______ _________________ and optimistic predictions about the future that prove to be off the mark likewise are immunized unless plaintiffs meet their ____________________ 4 In Capri Optics, we described our earlier decision, _____________ Backman v. Polaroid, 910 F.2d 10 (1st Cir. 1990) (en banc), as _______ ________ holding that there was no duty to disclose to market buyers information simply because it was material, or to amplify what was said, unless the omitted matter caused what was said to be misleading . . . . As an illustration, if defendant reported, correctly, without more, "This is our eighth consecutive quarter in which our gross has increased," there was no duty to add, for the benefit of market buyers, "We are concerned about the next one." We recognized, of course, that "if defendant's apprehension was of a disaster the rule might be different . . . ." -5- burden of demonstrating intentional deception, see Greenstone v. ___ __________ Cambex Corp., 975 F.2d 22, 25-26 (1st Cir. 1992) (there is no ____________ "`fraud by hindsight'"); DiLeo, 901 F.2d at 627 (same). See also _____ ___ ____ Shapiro, 964 F.2d at 283-84 n.12 (quarterly report stating that _______ the company "looks to the future with great optimism . . . is clearly inactionable puffing"). Third, and finally, general averments of the defendants' knowledge of material falsity will not suffice. Greenstone, 975 __________ F.2d at 25. Consistent with Fed. R. Civ. P. 9(b), the complaint must set forth "specific facts that make it reasonable to believe that defendant[s] knew that a statement was materially false or misleading." Id. The rule requires that the particular "`times, ___ dates, places or other details of [the] alleged fraudulent involvement'" of the actors be alleged. In re Glenfed, 11 F.3d _____________ at 847-48 (citation omitted). See also Romani v. Shearson Lehman ___ ____ ______ _______________ Hutton, 929 F.2d 875, 878 (1st Cir. 1991); New England Data ______ _________________ Services v. Becher, 829 F.2d 286, 288 (1st Cir. 1987) ("[I]n the ________ ______ securities context, and in general, this circuit has strictly applied Rule 9(b)."). With this framework in mind, we begin our scrutiny of plaintiffs' allegations. III. The Third Amended Complaint contains 63 paragraphs ( 23- 86) describing the misstatements and omissions allegedly made by defendants during the class period from June 17, 1987 through October 23, 1989. We have read the paragraphs line-by-line, and -6- agree with the district court that much of complaint fails to establish an actionable 10b-5 claim. Many of the challenged statements either were undisputedly true representations of the company's circumstances, or are unaccompanied in the complaint by specifics tending to show knowing falsity. Other portions of the _______ complaint are inadequate because they allege improper conduct in wholly conclusory terms. The complaint is more successful in stating a claim concerning statements made during late 1988 and 1989, when plaintiffs contend that the bank was experiencing accelerated loan deterioration. Public announcements during that time suggested that the bank's loan business was under control while plaintiffs allege that the bank recognized that its problems were severe, particularly that its ALL was inadequate and its internal procedures for identifying problem loans deficient. In the following sections, we explain our conclusions by considering in detail various portions of the complaint. We do not examine separately each allegation contained in this voluminous pleading, but believe our discussion is sufficiently complete and illustrative to enable the district court to distinguish the actionable from the inactionable in the remaining paragraphs. Sales of stock and mortgage-backed securities, __________________________________________________ 23-25. These paragraphs describe Bank Shares' substantial _____ losses in June and July 1987 when it sold certain mortgage backed securities, as well as stock that it unlawfully held in eight banking companies. Plaintiffs allege that, with the approval or -7- acquiescence of "Bank Shares['] purportedly independent auditors," the company knowingly allocated these losses to the improper fiscal quarters of 1987. As a result, plaintiffs allege, Amoskeag's announced earnings for the quarter ended June 30, 1987 were artificially inflated. The complaint also criticizes the defendants' failure to recognize loss on the company's equity securities portfolio until the end of the year. We fail to find a basis for actionable securities fraud in these paragraphs. Plaintiffs allege no representations inconsistent with the bank's state of affairs.5 The fact that the company was in violation of federal law by its ownership of the financial institution stock may reflect poorly on its management, but in no way demonstrates a 10b-5 violation. Nothing in the complaint suggests that the decision of Bank Shares to delay its equity security loss until the end of the year was fraudulent, even if, as the complaint alleges, it was a violation of Generally Accepted Accounting Principles (GAAP). Indeed, the complaint acknowledges that Ernst & Whinney, Bank Shares' accounting firm, approved the method by which the company recognized its losses, arguably casting doubt on the existence of any impropriety.6 ____________________ 5 A general allegation that the practices at issue resulted in a false report of company earnings is not a sufficiently particular claim of misrepresentation. 6 As a result of our conclusion that these paragraphs, as well as 26-42, were dismissed properly for lack of actionable allegations, we need not address defendants' contention that they should be stricken as time-barred. -8- Reversal of $275,000 in 1987 loan loss provision, 26-30. ___________________________________________________________ These paragraphs allege that, at the end of the second quarter of 1987, defendants reversed an allocation of $275,000 that had been made earlier in the year to its loan loss provision "for no reason other than arbitrary manipulation" designed "to offset the impact of other losses." Plaintiffs claim that defendants falsely represented in their Form 10-Q for the quarter that the decrease was attributable to the credit quality of the bank's loan portfolio. This conclusory allegation of falsity is unsupported by any specific facts. Plaintiffs offer no basis for inferring that the defendants knew that the bank's loan portfolio was, at that time, improperly characterized as "excellent." They provide no information about the general health of the company's loan portfolio, and fail to cite any specific loans that were in trouble. Defendants' 10-Q states that the decision to reduce the loan loss provision was attributable to, inter alia, the sale of _____ ____ $48 million in loans and the low level of non-performing loans. The figures and statistics contained in the document are not alleged to be inaccurate. We consequently find no actionable, particularized allegation of fraud in this portion of the complaint. Economic outlook and internal review, 1987 Annual Report, ____________________________________________________________ 33-43.7 _____ ____________________ 7 Paragraph 32 quotes at length from the company's 1987 annual report and suggests that its "decidedly upbeat" tone was fraudulent. Plaintiffs acknowledge, however, that the bank -9- This portion of the complaint describes a growing awareness by the Company of the slowdown in the real estate market, and recognition of the need to quantify possible losses inherent in its loan portfolio. The complaint alleges: [C]ontrary to public representations, by February 1988, the defendants had determined that the existing loan review function was unable to keep up with timely reviews of the Company's loan portfolios (which were known by defendants to be deteriorating in creditworthiness due to changes in the economy) and the Company lacked sufficient loan credit file documentation to properly analyze the ALL. Thus, the Company hired a retired career banker, J. Howard "Mac" McGloon, on a consulting basis to review lending practices and ostensibly to assist the Loan Review department in its function. 34. Nothing in the following paragraphs, which describe various "public representations" contained in the company's 1987 annual report, supports the assertion that officials knowingly misrepresented the bank's ability to manage its loan portfolio. That a consultant was hired to assist with loan review is not inconsistent with the company's statement, cited in 37, that "[m]anagement closely monitors the quality of the loan and lease financing portfolio." Getting the help needed to stay on top of the situation, or to improve it, is one aspect of close monitoring.8 ____________________ disclosed the substantial drop in net income from the prior year and the substantial loss in equity securities. No facts suggest knowing falsity in any of the company's optimistic statements about its future prospects. 8 Similarly, plaintiffs fail to demonstrate any basis for inferring knowing falsity in the defendants' statement, also quoted in 37 of the complaint, that "the Company's basic -10- Although 40-42 allege that, during early 1988, defendants failed to follow internal policy for recognizing earnings on commercial real estate loans and to allocate the appropriate ALL amount for such loans, the complaint does not demonstrate how these flaws in procedure add up to a securities violation. As noted earlier, "mere failure to provide adequate reserves (or to perform competently other management tasks) does not implicate the concerns of the federal securities laws and is not normally actionable," Shapiro, 964 F.2d at 281. _______ Plaintiffs additionally complain about the tone of a press release issued by the company on July 14, and the company's quarterly report filed with the SEC on August 12. These reports were misleadingly positive, plaintiffs allege, because they stated that earnings were down in part because of an increase in loan reserves designed as a "safeguard against an extended slowdown in real estate and condominium markets." See 43. ___ There is nothing actionable in these statements, which simply report the company's reduced earnings and one of the reasons for it. Chaston finds "serious deficiencies"; internal concerns; ____________________________________________________________ "conservative" approach, 46-69. _________________________________ This portion of the complaint primarily describes events and information relating to the bank's handling of its ALL in late 1988 and early 1989, as well as corresponding public statements ____________________ banking business is strong as indicated by the excellent quality of the loan and lease financing portfolio." -11- made by the defendants about those matters. In our view, it is the only section of the complaint that contains allegations sufficiently particular and pertinent to survive defendants' motion to dismiss. The scenario depicted by these allegations can be summarized as follows: at least by August 1988, the company had become aware that the quality of its commercial loans had deteriorated significantly, and that the loan review department was having difficulty staying on top of problem loans, particularly in commercial real estate. See 47.9 This prompted the hiring of ___ a consulting firm, Chaston Associates, that began work in mid- October. Chaston reported within two weeks that there were "serious deficiencies" in the ALL at Amoskeag, and this finding was partly responsible for a $6 million increase in loan loss reserves at the end of the third quarter, September 30, 1988. See 46. Meanwhile, internal reviews also had revealed ___ deficiencies in the ALL at both Nashua Trust Company (NTC) and Amoskeag, and the auditor concluded that "additional injections to the reserve [at Amoskeag] are required as soon as financially feasible." 50 (a), (b). ____________________ 9 This paragraph alleges that, on August 10, 1988, Bank Shares' vice president and loan review officer Worden informed an Ernst & Whinney auditor that the quality of commercial loans had deteriorated since E&W's last audit review as of December 31, 1987, and that Worden did not believe that his department was devoting an adequate amount of time to the monitoring of the appropriateness of credit quality ratings assigned by Amoskeag's loan officers, particularly in the area of CRE [commercial real estate] loans. -12- Plaintiffs juxtapose these allegations showing internal awareness of review problems and inadequate loan loss reserves with the company's public statements characterizing its loan review capabilities as "strong" and its ALL approach as "conservative." In 52 of the complaint, for example, plaintiffs cite a press release issued on October 24, 1988, announcing third quarter earnings that were substantially reduced from the same period a year earlier. The paragraph continues: Defendants Machinist and Allen made the following false and misleading statements in the press release with respect to the increase in loan loss provision: . . . [W]e have experienced a build-up of non-performing loans to $47 million, or 2.7 percent of total loans, from $35 million at June 20, 1988, the majority of which relates to commercial real estate. Our loan Our loan review capabilities are strong and we have directed review capabilities are strong and we have directed specific resources to each of those loans. specific resources to each of those loans The decision to make a substantial addition to the loan reserve is consistent with past practice of the consistent with past practice of the company to address issues in a timely and conservative company to address issues in a timely and conservative manner. We strongly believe this action will ensure manner the integrity of our financial statements and solidify the foundation for future earnings gains. 52 (some emphasis added, other omitted). Plaintiffs quote similar remarks by defendant Allen at a combined meeting of New York and New England stock analysts on October 28, 1988, and by defendants Machinist and Allen in a press release issued on January 30, 1989: We at Amoskeag are risk-averse bankers. If risk-averse the banking business involves the fundamental choice between eating well and sleeping well, we'll cut back a little on the calories for more peace of mind. We have excellent people We have excellent people -13- in loan review. They oversee a comprehensive in loan review. They oversee a comprehensive reporting and monitoring system reporting and monitoring system *** When we allocated $6 million to the loan loss reserve in the third quarter, we worked from we worked from very conservative assumptions. We considered very conservative assumptions all the factors and assumed less-than- favorable economic conditions. Higher short- term rates. Low overall economic growth. Further potential softening in real estate markets. We made this decision without prompting from We made this decision without prompting from regulators or accountants. regulators or accountants 56 (emphasis added). While non-accrual loans rose in the fourth quarter, from $26.6 million to $35.8 million, the rate of increase in problem loans has moderated. We are managing those We are managing those loans intensively and with success. loans intensively and with success The real estate market is turning around slowly and further reductions of excess inventory have been realized. Our policy of Our policy of reserving conservatively in advance of need reserving conservatively in advance of need is being validated. We remain well secured is being validated We remain well secured and confident of the values underlying our and confident of the values underlying our loans. loans 62 (some emphasis added, other omitted). Plaintiffs also allege that, despite company awareness that "additional injections to the reserve" were required, see ___ 50(b), 59, 60, a management statement contained in Bank Shares' 1988 Annual Report, filed with the SEC in late March 1989, observed that "[i]t is management's judgment that the allowance for loan and lease losses at year-end 1988 is sufficient to absorb losses inherent in the existing portfolio," 68. See ___ also 64 (defendants stated in annual report that amount of ____ -14- increase in the ALL from year-end 1987 to year-end 1988 is "a prudent and proper course for today"); 69(d).10 In this series of allegations, plaintiffs do more than simply identify management problems or point to statements that put a positive spin on the company's circumstances, without indicating how or why defendants should have known the descriptions were inaccurate. Rather, these paragraphs present a contrast between what company officials were hearing internally about their loan review effectiveness and the adequacy of their ALL, and what the company was telling the public at the same ____________ time. Cf. Romani, 929 F.2d at 878-80 (complaint contains no ____ ___ ______ factual allegations supporting a reasonable inference that adverse circumstances were known and deliberately or recklessly disregarded by defendants); Hayes, 982 F.2d at 106 ("[P]laintiff _____ alleges more than mismanagement. He alleges that defendants made affirmative representations inconsistent with the state of corporate affairs they knew to exist."). When defendants "affirmatively characterize[] management practices as `adequate,' ____________________ 10 In 69(d), plaintiffs allege that on about February 21, 1989, the company's audit committee was told by its accounting firm, Ernst & Whinney, that a Chaston report "presented management and E&W with a problem" since Chaston had concluded the allowances for loan loss at both Amoskeag and NTC were inadequate by a combined total of $9.4 million. E&W further told the Audit Committee it had been required to expend "significant effort in reviewing [a] large number of individual loans to support adequacy of a reserve less than Chaston felt was needed." -15- `conservative,' `cautious,' and the like, the subject is `in play.'" Shapiro, 964 F.2d at 282. _______ For example, if a defendant represents that its lending practices are "conservative" and that its collateralization is "adequate," the securities laws are clearly implicated if it nevertheless intentionally or recklessly omits certain facts contradicting these representations. Likewise, if a defendant characterizes loan loss reserves as "adequate" or "solid" even though it knows they are inadequate or unstable, it exposes itself to possible liability for securities fraud. By addressing the quality of a particular management practice, a defendant declares the subject of its representation to be material to the reasonable shareholder, and thus is bound to speak truthfully. Id. See also In Re Wells Fargo, 12 F.3d at 930; Hayes, 982 F.2d ___ ___ ____ ___________________ _____ at 106-07. These allegations also are sufficiently particular to meet the requirements of Rule 9(b). In the paragraphs at issue, plaintiffs specifically identify the internal reports and the public statements underlying their claims, providing names and dates. Although this section of the complaint would be strengthened if it contained specific examples of problem loans requiring a higher ALL, see In Re Wells Fargo, 12 F.3d at 926-28, ___ _________________ the summaries of the auditors' and consultants' reviews serve the same purpose. Both permit an inference that the bank knew, or should have known, that its public statements were inconsistent with the actual conditions then being reported to them. The ____ -16- complaint does not simply rely on poor performance in the aftermath of positive reports.11 Despite our conclusion that certain allegations survive threshold consideration, we note that plaintiffs remain a great distance from actually proving securities fraud. Their ability to demonstrate that defendants acted with fraudulent intent in making the various representations about Bank Shares' conservative ALL approach may depend, inter alia, on whether _____ ____ company officials in good faith believed their allocations were adequate, and considered the increases recommended by the consultants to be "ultra" conservative, and thus excessive. See ___ In Re Wells Fargo, 12 F.3d at 927 ("[T]he setting of loan loss __________________ reserves is, by all accounts, an `art and not a science' . . . . "). The precise timing of certain statements in relation to the bank's ALL activity also is crucial.12 ____________________ 11 The complaint does not entirely lack reference to specific loans. For example, in paragraphs 48 and 49, plaintiffs aver that, in meetings held on August 16, 1988, an Ernst & Whinney representative was told by the head of Amoskeag's commercial real estate (CRE) division that certain CRE loans "were now `maturing' and some were beginning to evidence signs of deterioration not previously evident." 48. The Amoskeag officer, Stephen Bradbury, noted in particular residential condominiums, for which the bank had 18 or 19 outstanding loans. Additionally, plaintiffs allege that E&W learned from the head of Amoskeag's private banking division of a number of large, unsecured problem loans, three of which are specifically identified. 49. The complaint does not allege a connection, however, between these specific loans and the asserted problems with internal monitoring and inadequate ALL. 12 While a generous reading of the allegations in this section would permit the inference that Bank Shares was representing its ALL as adequate and "conservative" at the same time that it was receiving multiple reports that it was not, it also is possible that some of the disputed statements occurred -17- Similarly, the contested statements regarding the quality of Bank Shares' loan management capabilities may turn out to be neither material nor misleading if, for example, hiring consultants is a typical strategy of aggressive bank managers to prevent more serious problems. In other words, defendants may show that, in the banking context, "effective" loan monitoring often includes adding hired experts to the company's own internal procedures. We note, as an additional caveat to the court and the parties, that not every paragraph in this section of the complaint contains actionable allegations,13 and even those paragraphs that cannot be dismissed in their entirety as a matter of law may contain allegations and wholly conclusory statements ____________________ only in the aftermath of corrective action -- in particular, the $6 million allocation as of September 30, 1988 -- and that bank officials thus reasonably believed that their reports were accurate. For example, the review of Amoskeag's ALL performed by the company's Internal Audit Department "[a]s of September 30, 1988" indicated the need for "additional injections" to the ALL, but it is not clear whether this assessment was based on the amount of reserves before or after the $6 million was allocated retroactively to the third quarter. See 50(b). Indeed, it is ___ necessary to determine whether Bank Shares in October 1988 viewed the $6 million as a complete solution to the identified problems, or knew that it was only a partial response to Chaston's initial findings, in order to evaluate its public statements. See, e.g., ___ ____ 46, 54, 55, 57, 62. 13 For example, 61 states that defendants Allen, Yakovakis and Machinist were "not surprise[d]" by Chaston's conclusion that the Amoskeag and NTC ALLS were inadequate by a total of $12.1 million. The paragraph fails to identify with the required particularity the conversations on which it is based, giving no information about when and where these conversations supposedly took place. Similarly, nothing in 58, which addresses "below market rate" loans given to condominium purchasers, gives rise to an inference of fraud, as distinguished from simple mismanagement. -18- that warrant no further attention.14 Although we leave to the district court's discretion how it chooses to proceed upon remand, we suspect that it may wish to direct plaintiffs to submit a revised, limited complaint consistent with this decision before conducting further proceedings. Cf. Shapiro, 964 F.2d at ___ _______ 284 (directing plaintiffs to reorganize complaint on remand to facilitate evaluation).15 Continuing loan deterioration, declining earnings, ____________________________________________________________ increasing ALL, 70-86. ________________________ These allegations detail developments beginning in mid-1989 with Bank Shares' acknowledging a substantial problem with non- performing loans, prompting dramatic increases in its ALL (including a $31.5 million addition to the previously announced $6.1 million allocation for the first quarter), and ultimately resulting in a reported net loss of $50.7 million for fiscal year 1989. Presumably, plaintiffs seek to establish in this section of the complaint that the precipitous drop in Bank Shares' ____________________ 14 In 53, for example, plaintiffs allege that "defendants knew that the provision for loan losses in prior periods had been arbitrarily understated without regard to the requirement of the ALL, for the purposes of manipulating and artificially increasing the Company's reported earnings." This language re-introduces the allegations surrounding the 1987 decrease in the ALL, but it is no more supportable at this point than it was earlier. See ___ supra at 8-9. _____ 15 Although we have focused on the section of the complaint labeled "Class Period Misstatements and Omissions," we note that significant portions of paragraphs 87 to 106, describing plaintiffs' cause of action, also could be substantially reduced if the district court chooses to order plaintiffs to amend their complaint before taking further action. -19- financial condition was not really so precipitous, and thus reflects the company's earlier concealment of its poor situation. This approach, however, is simply an impermissible effort to establish fraud through hindsight. It is well established that plaintiffs in a securities action have not alleged actionable fraud if their claim rests on the assumption that the defendants must have known of the severity of their problems earlier because conditions became so bad later on. See Kowal v. MCI ___ _____ ___ Communications Corp., 16 F.3d 1271, 1278 (D.C. Cir. 1994); _____________________ Greenstone, 975 F.2d at 25 (Rule 9(b) not satisfied by general __________ averment that "defendants `knew' earlier what later turned out badly"). See also supra at 5-6. Unlike the earlier section of ___ ____ _____ the complaint, detailing the basis for the alleged inconsistency between defendants' knowledge and their public statements, there are no facts stated here with any particularity from which an inference of fraud reasonably can be drawn. The complaint instead states that bank examiners in May reported the need for an increased ALL, see 73, that Bank ___ Shares at approximately that time obtained an extension for filing its first quarter report for 1989 so that it could readdress the adequacy of its ALL, see 75, and that it shortly ___ thereafter made a substantial increase, see 76. From all that ___ appears, Bank Shares acted properly in doing what it was advised -20- to do, while reporting accurately that it was taking these steps because of "real estate related loan problems," see 79.16 ___ The concluding paragraphs in this section of the complaint describe various Chaston reports on Bank Shares' loan management procedures and its ALL, as well as the company's reports of its losses in the third and fourth quarters of 1989. See 81-86. ___ None of them provides a basis for a securities fraud claim. IV. In addition to its claim against Bank Shares as a corporation, plaintiffs allege liability against seven individual former officers and directors of the company. The district court did not address the sufficiency of these allegations in the Third Amended Complaint, but did reject the claims as insufficiently particular when it reviewed an earlier version. See Shields v. ___ _______ Amoskeag Bank Shares, 766 F. Supp. 32, 40-41 (D.N.H. 1991). ____________________ We conclude that, with respect to five of the seven defendants, the complaint alleges a sufficiently specific connection to certain of the challenged statements that dismissal ____________________ 16 Plaintiffs point to a statement in Bank Shares' 10-Q for the second quarter of 1989, filed with the SEC on about August 1, explaining that the increase in the provision for loan and lease losses "was the result of management's assessment of the adequacy of the allowance for loan and lease losses in light of [the] judgment that there has been significant deterioration in the condition of problem loans since year-end," 79. Nothing in the complaint suggests that this was other than an accurate depiction of what occurred. That "management's assessment" may have been affected by the views of examiners or consultants does not make the statement a fraudulent misrepresentation. In asserting in 80 that this statement was knowingly false and misleading, plaintiffs provide only conclusory support lacking in particularity. -21- of plaintiffs' claims as a matter of law is inappropriate. With the exception of Bushnell and Woolson, all of the defendants are alleged to have signed the 1988 Annual Report in which Bank Shares' loan loss reserves were depicted as "sufficient" and "prudent," see supra at 14; Complaint, at 64,17 and also are ___ _____ alleged to have received copies of the internal auditor's report concluding that additions to the reserves were required as soon as possible, Complaint, at 50-51, as well as Chaston's report in December 1988 stating that the ALL was inadequate, id. at ___ 59-61. The acceptance of responsibility for the contents of the Annual Report, demonstrated by defendants' signatures, combined with specific allegations that they knew of conflicting conditions, establishes a sufficient link between the defendants and the alleged fraud to satisfy Rule 9(b)'s particularity requirement. Cf. Romani, 929 F.2d at 880 n.4; Wool v. Tandem ___ ______ ____ ______ Computers Inc., 818 F.2d 1433, 1440 (9th Cir. 1987) ("In cases of ______________ corporate fraud where the false or misleading information is conveyed in . . . annual reports . . . or other `group-published ____________________ 17 The complaint alleges that Bushnell was chairman and chief executive officer of Bank Shares until his resignation in early 1988, and he therefore was no longer with the company when the 1988 Annual Report was written and released. Indeed, because all of the actionable allegations concern the time period after his departure, we affirm his dismissal from the case. Woolson is the only defendant not alleged to have been a director of Bank Shares, and thus not a signatory of the holding company's Annual Report. -22- information,' it is reasonable to presume that these are the collective actions of the officers.").18 Defendants Machinist and Allen are identified as the authors or speakers of the other statements contained in the paragraphs that survive dismissal, and those allegations also remain live against them. As to those statements, the other defendants are alleged only to have authorized or acquiesced in them (the press releases), or they are attributed no role at all in the dissemination of the statements (remarks by Allen and Machinist at analysts meeting). See 52, 56. This is insufficient to ___ meet the requirements of Rule 9(b).19 Defendants assert that the complaint fails in any respect to state an actionable claim against the individual defendants because there are no allegations from which scienter reasonably may be inferred, such as that they sold their personal stock in Bank Shares during the class period. They argue that it is insufficient to base a claim of fraudulent intent on allegations that defendants sought to protect their compensation and prestige. See Complaint at 105. See also Tuchman v. DSC ___ ___ ____ _______ ___ Communications Corp., 14 F.3d 1061, 1068-69 (5th Cir. 1994).20 ____________________ ____________________ 18 We see no need to distinguish at this juncture between plaintiffs' primary and secondary liability theories. 19 Because these are the only relevant allegations relating to Woolson, he, like Bushnell, is entitled to dismissal. 20 The Fifth Circuit in Tuchman endorsed language from the _______ district court's opinion in that case rejecting the pursuit of increased compensation as a sufficient basis for inferring fraud: -23- We agree that allegations that defendants committed fraud to save their salaries or jobs ordinarily will not be enough to support a reasonable inference of scienter if the complaint lacks any other basis for inferring fraudulent intent. In this case, however, plaintiffs have done more than simply aver generally that defendants knowingly misrepresented Bank Shares' circumstances, while relying on a job-preservation motive to establish the element of scienter. As described above, plaintiffs specifically cited reports and documents presented to defendants at relevant times that were inconsistent with the defendants' public statements. This satisfies the necessary pleading requirements. See In Re Wells Fargo, 12 F.3d at 931 ___ __________________ ("While `allegation[s] of unusual insider trading by defendants immediately preceding the disclosure of negative news' may be . . . a characteristic of a `typical securities fraud class action,' they are not required.").21 ____________________ On a practical level, were the opposite true, the executives of virtually every corporation in the United States would be subject to fraud allegations. It does not follow that because executives have components of their compensation keyed to performance, one can infer fraudulent intent. 14 F.3d at 1068-69 (quoting 818 F. Supp. 971, 976 (N.D. Tex. 1993)). 21 Nothing in Tuchman, a case emphasized by defendants at _______ oral argument, is to the contrary. In that case, the Ninth Circuit observed that "[w]here a defendant's motive is not apparent, a plaintiff may adequately plead scienter by identifying circumstances that indicate conscious behavior on the part of the defendant, though the strength of the circumstantial allegations must be correspondingly greater." 14 F.3d at 1068. After rejecting the desire to preserve incentive compensation and similar "perquisites and emoluments of office" as a sufficient -24- V. We conclude that the plaintiffs have stated a claim against Bank Shares and five of the individual defendants based on certain of the allegations contained in paragraphs 46 to 69, with such limitations and exclusions as previously described. To that extent, the dismissal of the Third Amended Complaint is reversed. The district court may choose to require a Fourth Amended Complaint, consistent with this decision, before conducting further proceedings. In all other respects, the district court's decision is affirmed.22 Affirmed in part, reversed in part, and remanded. No costs. ________________________________________________ _________ ____________________ basis for an inference of scienter, the court looked to whether plaintiffs otherwise had established fraudulent intent. It found that they had not, observing that the complaint failed to assert "any fact that makes it reasonable to believe that the defendants knew that any of their statements were materially false or misleading when made." Id. at 1069. This case is ___ distinguishable because, as we have discussed, plaintiffs here have alleged facts from which an inference of knowledge reasonably may be drawn. 22 We note that the complaint indicates that only one of the three named plaintiffs, Nishan Serabian, purchased shares during the time period giving rise to the actionable allegations, and it therefore appears that plaintiffs Horvei and Lo Priore no longer are proper parties. The district court will need to address this matter on remand. -25-