<head>

<title>USCA1 Opinion</title>

<style type="text/css" media="screen, projection, print">

<!--

@import url(/css/dflt_styles.css);

-->

</style>

</head>

<body>

                United States Court of Appeals
                    For the First Circuit

No. 98-2194

              LAWRENCE M. GREEBEL, RICHARD CRANE,  
          BRIAN D. ROBINSON, and JOHN and ANN SOMERS
                  on behalf of themselves and  
                 all others similarly situated,

                          Appellants,

                               v.

         FTP SOFTWARE, INC.; ROBERT W. GOODNOW, Jr.;
      PENNY C. LEAVY; DOUGLAS F. FLOOD; JONATHAN RODIN;
           CHARLOTTE H. EVANS; and DAVID H. ZIRKLE,

                           Appellees.

          APPEAL FROM THE UNITED STATES DISTRICT COURT

               FOR THE DISTRICT OF MASSACHUSETTS

          [Hon. Joseph L. Tauro, U.S. District Judge]

                             Before

                    Torruella, Chief Judge,
              Noonan and Lynch, Circuit Judges.
                                
                                
                                
                                
    Stephen Moulton, with whom Nancy Freeman Gans and Moulton &
Gans, LLP, and Sanford P. Dumain, with whom Samuel H. Rudman and
Milberg Weiss Bershad Hynes & Lerach LLP, were on brief, for
appellants.
    Bruce G. Vanyo, with whom Jerome F. Birn, Jr., Rebecca A.
Mitchells, and Wilson Sonsini Goodrich & Rosati, were on brief for
appellee FTP Software, Inc.
    Jeffrey B. Rudman, with whom Peter J. Macdonald and Hale and
Dorr LLP, were on brief, for individual appellees.
    Harvey J. Goldschmid, General Counsel, Jacob H. Stillman,
Solicitor, Eric Summergrad, Deputy Solicitor, and Luis de la Torre,
Attorney, on brief for amicus curiae Securities and Exchange
Commission.

October 8, 1999

 LYNCH, Circuit Judge.  This case requires us for the
first time to interpret the provisions of the Private Securities
Litigation Reform Act of 1995, 15 U.S.C.  78u-4.  Plaintiffs,
purchasers of FTP Software stock from July 14, 1995 to January 3,
1996, brought suit under sections 10(b) and 20(a) of the Securities
Exchange Act of 1934, 15 U.S.C.  78j(b), 78t(a).  During the
period of plaintiffs' purchases, the stock reached a high of
$38.875 per share.  On January 4, 1996, the company announced that
sales growth had declined and that it would have lower earnings.  
That same day, the stock price fell 52% on heavy trading, from
$25.25 to $11.875 per share.  By August 9, 1996, the stock price
was $8 per share.  Plaintiffs' suit was filed on March 3, 1996.  It
was dismissed on September 24, 1998.  See Greebel v. FTP Software,
Inc., 182 F.R.D. 370, 376 (D. Mass. 1998).
 We affirm the dismissal of the complaint under the
standards we now adopt:
1. The PSLRA imposes requirements for pleading with particularity
that are consistent with this circuit's prior rigorous requirements
for pleading fraud with particularity under Fed. R. Civ. P. 9(b).
2. The PSLRA mandates neither the adoption nor the rejection of
particular patterns of evidence to prove fraud and scienter, and
thus does not alter this circuit's prior law on these points.
3. The PSLRA does, significantly, impose a requirement that
pleadings raise a "strong" inference of scienter rather than a
merely "reasonable" inference of scienter.
4. The PSLRA does not alter the previous definition of scienter,
one that in this circuit includes a narrowly defined concept of
recklessness which does not include ordinary negligence, but is
closer to being a lesser form of intent.
                               I
 The district court denied defendants' first motion to
dismiss largely on the basis of the complaint's allegations that
defendants had routinely "whited out" the contingency terms
inserted by customers into purchase orders; this was allegedly done
in furtherance of a scheme to inflate revenues by improperly
booking contingent transactions as final sales.  After limited
discovery, the district court concluded that plaintiffs could not
prove the white-out claims and entered judgment on those claims.  
The defendants renewed their motion to dismiss the complaint, and
the plaintiffs, in response, sought to make their allegations of
fraud more specific by referring to discovered documents, but did
not formally move to amend.  The district court dismissed the
complaint with prejudice, thus effectively denying the plaintiffs
an opportunity to amend their complaint.  The court did so without
deciding whether, in light of the new evidence and allegations, the
complaint was adequate to survive.
 Plaintiffs appeal saying that summary judgment on the
white-out allegations was inappropriate; that they are given refuge
by Rule 56(f); that the dismissal of the remaining allegations was
improper; and that they were entitled to amend their complaint.
                               II
  The complaint alleges the following.  FTP Software, Inc.
develops, markets, and supports Internet and Intranet software for
personal computers and networks.  By the beginning of the Class
Period (from July 14, 1995 to January 3, 1996), the demand for
FTP's software was diminishing because many of FTP's clients were
either developing the technology themselves or acquiring competing
systems from other manufacturers, such as Microsoft and Netscape.  
Microsoft, for example, was incorporating networking capabilities
into its new Windows 95 software, free of additional charge.  In
addition, FTP was struggling to keep pace with "revolutionary"
technological developments that threatened to render its software
obsolete.  In response, FTP and several of its directors and
officers through fraudulent schemes inflated FTP's stock price and
then made various false statements and material omissions.   
 Plaintiffs allege that FTP failed to disclose the threats
to its continued success, as well as several "questionable" sales
practices.  These included the making of "warehouse shipments" --
that is, booking a fictitious sale of a product to a non-existent
buyer, shipping that product to a warehouse for storage, and then
eventually returning it to FTP.  According to plaintiffs, one FTP
employee who complained about these shipments, and who refused (in
at least one instance) to sign for the product return, was
dismissed as a result of his protest, all before the Class Period.  
Other objectionable sales practices included excessively discounted
sales (as high as 90%) and "channel stuffing" activity that
compressed sales and orders into the final weeks of a fiscal
quarter, with the intention of "cosmetically" improving the
reported results for that quarter.  Finally, plaintiffs say that
FTP failed to disclose its practice of inducing distributors to
purchase more product than they needed by promising that the
distributors could return the unsold product.  Distributors would
send their orders to FTP with a notation that they were entitled to
return any unsold product.  FTP then booked these sales as revenue,
but because FTP understood that recognizing such sales as revenue
was improper (because of a right of return existed), it allegedly
instructed the sales force to white-out these right-of-return
notations on the distributors' order forms.  
 FTP also made several statements that the plaintiffs
characterize as false or materially misleading.  On July 14, 1995,
the first day of the Class Period, David Zirkle, FTP's President
and Chief Executive Officer, reported FTP's financial performance
results for the second fiscal quarter of 1995.  Zirkle declared:
"We are pleased with our performance for the second quarter.  Sales
continue to be strong in both our U.S. and international channels."  
Zirkle also touted the release of several new products, stating
that "[t]hese products should help us achieve our revenue objective
for the second half of 1995."  Plaintiffs argue that these comments
"falsely convey[ed] the impression that sales were, and would
continue to be, healthy and strong" and that this false impression
was deliberately aided by FTP's failure to disclose that in or
around January 1995, the French Post Office canceled its planned
purchase of $10 million of FTP products "due to the impending
release of 'Windows '95.'"
 On the same day, Zirkle discussed FTP's impending
corporate "reconfiguration" into two business units.  He predicted
that "FTP Software [would] lead the market in providing
applications and support that make it possible to share information
and access resources across workgroups, LAN's, enterprise networks
and the global Internet."   After this announcement, FTP's stock
fell from $31.75 to $28.25.  Zirkle dismissed this decline as
merely "a 'knee-jerk' reaction to the short-term impact of the
restructuring on earnings," and on the next trading day, the stock
recovered, closing at $30.875.  Plaintiffs argue that these
comments were misleading because Zirkle did not disclose that FTP's
costly investments in its reorganization would have to be continued
over the long term.
 FTP's management team next met with "the investment
community and with securities analysts" to promote the company's
products and stock.  One securities firm rated FTP as a "long-term
buy."  Plaintiffs assert that this report "and the estimates
contained therein were based upon communications with the
management of FTP and were of a nature that could only have been
provided (or be based on specific information provided) by [FTP]
and its management."
 Meanwhile, several of the individual defendants sold some
of their FTP stock.  In total, the six individual defendants sold
over $23 million in stock during the Class Period.   
 Zirkle made another false statement, plaintiffs say, on
October 25, 1995, when he reported FTP's financial results for the
third quarter of fiscal year 1995:
   This was another excellent quarter for FTP.  Sales
 continue to grow both in our U.S. and international
 channels . . . .  Our new ventures are also off to a good
 start with revenues of $2.7 million. . . .  These new
 products have been well received by our channel partners
 and customers and will help us in our efforts to achieve
 fourth quarter revenue objectives.

Plaintiffs assert that the "new ventures" Zirkle referred to were
failing to generate the expected new business.
 On November 15, 1995, FTP filed its Form 10-Q report for
the third quarter of 1995 with the SEC.  The report revealed a
dramatic increase in accounts receivable for the fiscal year ending
on December 31, 1994.  FTP explained that:
   Such an increase is primarily attributable to increased
 unit sales and a relative increase, during the third
 quarter of 1995, in the number of units shipped during
 the last month of such quarter compared to prior
 quarters.  The Company believes that it may continue to
 experience such a relative increase as it continues to
 grow, as is typical in the software industry.

Plaintiffs claim that the 10-Q report, and these statements, were
false and misleading because the increased unit sales were subject
to the purchasers' right to return unsold merchandise and were not
the result of FTP's growth.  
 FTP continued the "drumbeat" of misleading positive
statements, according to plaintiffs, when Zirkle, speaking in an
interview published in the November 27 - December 3, 1995 issue of
Mass High Tech, said that "[t]he networking business (TCP/IP) is a
cash cow that is feeding the development of other businesses, which
are feeding back new technology that makes the core business even
better."  In December 1995, two other securities firms issued
positive reports on FTP; after these statements, FTP's stock rose.
 Finally, the complaint alleges, the "truth [began] to
emerge" on January 4, 1996, when FTP announced that its earnings
for the fourth fiscal quarter of 1995 would be less than the same
period in 1994.  FTP stated that this decline reflected, in part,
the company's investment in its New Ventures Business Unit, but,
nonetheless, the company's stock fell $13.375 per share to close at
$11.875 per share (a one-day decline of 52%).  Plaintiffs emphasize
that this decline represented a $27 drop in market value (an
approximately 70% decrease) from a Class Period high of $38.875 per
share.
                              III
 On March 3, 1996, plaintiffs brought suit against FTP and
the individual defendants for violations of sections 10(b) and
20(a) of the Securities Exchange Act of 1934.  The defendants moved
to dismiss.  The procedural history was recited above.  The
district court ultimately granted summary judgment on the white-out
allegations because plaintiffs' only witness, Ms. Trudy Nichols,
was unavailable and her testimony was potentially inadmissible (as
hearsay).  Furthermore, the plaintiffs did not establish that the
defendants had ordered the alteration of any documents.
 The district court also granted the defendants' renewed
motion to dismiss.  The court found that the complaint failed to
plead the circumstances of fraud with specificity, and could not
even meet the pleading standards required to establish scienter
under Fed. R. Civ. P. 9(b).
                               IV
                 Interpretation of the PSLRA
 The enactment of the PSLRA in 1995 marked a bipartisan
effort to curb abuse in private securities lawsuits, particularly
the filing of strike suits.  See H.R. Conf. Rep. No. 104-369, at
32 (1995), reprinted in 1995 U.S.C.C.A.N. 730, 731.
 The PSLRA restated the requirements for securities fraud
actions at subsections 21D(b)(1) and (2), codified at 15 U.S.C.  
78u-4(b)(1)-(2).  Those provisions, involved here, read as follows:
   (b) Requirements for securities fraud actions
   (1) Misleading statements and omissions
     In any private action arising under this chapter in
 which the plaintiff alleges that the defendant  -

       (A) made an untrue statement of a material fact; or

       (B) omitted to state a material fact necessary in
     order to make the statements made, in the light of
     the circumstances in which they were made, not
     misleading;

   the complaint shall specify each statement alleged to
 have been misleading, the reason or reasons why the
 statement is misleading, and, if an allegation regarding
 the statement or omission is made on information and
 belief, the complaint shall state with particularity all
 facts on which that belief is formed.

   (2)  Required state of mind

     In any private action arising under this chapter in
 which the plaintiff may recover money damages only on
 proof that the defendant acted with a particular state of
 mind, the complaint shall, with respect to each act or
 omission alleged to violate this chapter, state with
 particularity facts giving rise to a strong inference
 that the defendant acted with the required state of mind.
    

15 U.S.C.  78u-4(b)(1)-(2).
 The parties and the SEC as amicus have framed different
possible interpretations of these provisions.  Essentially, these
questions are raised:
First, did the PSLRA alter the standards for pleading fraud with
particularity previously adhered to by this circuit?
Second, did the PSLRA restrict the characteristic patterns of facts
that may be pleaded in order to establish a "strong inference" of
scienter?  Specifically, are the two methods of showing scienter
endorsed earlier by the Second Circuit -- motive and opportunity or
circumstantial evidence of reckless or conscious behavior
sufficient to raise a "'strong inference' of fraudulent intent,"
see, e.g., In re Time Warner Inc. Sec. Litig., 9 F.3d 259, 268-69
(2d Cir. 1993) (quoting  O'Brien v. National Property Analysts
Partners, 936 F.2d 674, 676 (2d Cir. 1991) (internal quotation
marks omitted)) -- now available?   
Third, did the PSLRA alter the scienter requirement for actions
under section 10(b) and Rule 10b-5, 17 C.F.R.  240.10b-5?  
Specifically, is some form of recklessness sufficient to satisfy
the scienter requirement?  
 The parties and amicus all rely heavily on competing
excerpts from the congressional history of the Act and on the pre-
Act case law from the Second Circuit.
 The words of the statute are the first guide to any
interpretation of the meaning of the statute.  The usual maxim is
that courts do not go beyond the text of the statute if the meaning
is plain.  See United Food & Commercial Workers Union, Local 328 v.
Almac's Inc., 90 F.3d 1, 5 (1st Cir. 1996).  But that maxim has
inherent flexibility.  Even seemingly straightforward text should
be informed by the purpose and context of the statute.  See
Stafford v. Briggs, 444 U.S. 527, 535 (1980); Puerto Rico Tel. Co.
v. Telecommunications Regulatory Bd., No. 98-2228, 1999 WL 618061,
at *6 (1st Cir. Aug. 19, 1999).  Both this court and the Supreme
Court have checked a sense of a statute's plain meaning against
undisputed legislative history as a guard against judicial error.  
See, e.g., Bob Jones Univ. v. United States, 461 U.S. 574, 586
(1983) ("It is a well-established canon of statutory construction
that a court should go beyond the literal language of a statute if
reliance on that language would defeat the plain purpose of the
statute . . . ."); Cablevision of Boston v. Public Improvement
Comm'n, 184 F.3d 88, 101 (1st Cir. 1999).  If the meaning is not
plain from the words of the statute, then resort to legislative
history is required.  See Akins v. Penobscot Nation, 130 F.3d 482,
488 (1st Cir. 1997).
 On some of the points neither text nor history is
indisputably clear.  The legislative history is irretrievably
conflicted as to the second issue -- which characteristic patterns
of facts may be pleaded in order to establish a "strong inference"
of scienter -- with all sides finding some support for their
positions.  About all that can be said with confidence on that
issue is that Congress agreed on the need to curb abuses, that it
attempted to do so in the guise of what are articulated as
procedural requirements, and that there was agreement on the words
of the statute and on little else.  And so we return to the text of
the statute and its purpose.
A.  Pleading Standards for Fraud Allegations
 The text of the Act requires now that any complaint
alleging that a statement or omission is misleading must:
          1.     specify each statement alleged to have been
        misleading,
          2.     [specify] the reason or reasons why the statement
        is misleading,
          3.     and, if an allegation regarding the statement or
        omission is made on information and belief, . . .
        state with particularity all facts on which that
        belief is formed.  

15 U.S.C.  78u-4(b)(1).  The effect of this is to embody in the
Act itself at least the standards of Rule 9(b), Fed. R. Civ. P.
 Before the PSLRA, a securities fraud claim had to meet
the standards set by Rule 9(b).  See Simcox v. San Juan Shipyard,
Inc., 754 F.2d 430, 439 (1st Cir. 1985).  Rule 9(b) provides that
"[i]n all averments of fraud or mistake, the circumstances
constituting fraud or mistake shall be stated with particularity.  
Malice, intent, knowledge, and other condition of mind of a person
may be averred generally."  Fed. R. Civ. P. 9(b).  This circuit has
interpreted Rule 9(b) to require "specification of the time, place,
and content of an alleged false representation."  McGinty v.
Beranger Volkswagen, Inc., 633 F.2d 226, 228 (1st Cir. 1980).  
"Even where allegations are based on information and belief,
supporting facts on which the belief is founded must be set forth
in the complaint.  And this holds true even when the fraud relates
to matters peculiarly within the knowledge of the opposing party."  
Hayduk v. Lanna, 775 F.2d 441, 444 (1st Cir. 1985) (internal
quotation marks and citations omitted).
 The PSLRA's pleading standard is congruent and consistent
with the pre-existing standards of this circuit.  This circuit has
been notably strict and rigorous in applying the Rule 9(b) standard
in securities fraud actions.  See Maldonado v. Domnguez, 137 F.3d
1, 9 (1st Cir. 1998) ("This court has been especially rigorous in
applying Rule 9(b) in securities fraud actions . . . .") (quotation
marks omitted); Shaw v. Digital Equip. Corp., 82 F.3d 1194, 1223
(1st Cir. 1996) (similar); Romani v. Shearson Lehman Hutton, 929
F.2d 875, 878 (1st Cir. 1991) ("We have been especially rigorous in
demanding . . . factual support in the securities context . . .
.").
 The requirements of the PSLRA's new pleading standard in
78u-4(b)(1) were largely imposed under First Circuit law,
although this court has not used the same precise terminology.  
First, this court had already required a fraud plaintiff to specify
each allegedly misleading statement or omission.  See, e.g.,
Romani, 929 F.2d at 878 (plaintiffs' isolation of the offering
materials as the source of the alleged fraud was "sufficient to
identify the time and place of the alleged misrepresentations");
New England Data Servs., 829 F.2d at 292 (rejecting plaintiffs'
claims as merely "conclusory allegations of mail and wire fraud .
. . with no description of any time, place or content of the
communication").
 Second, this court has required a securities fraud
plaintiff to explain why the challenged statement or omission is
misleading by requiring that "the complaint . . . provide some
factual support for the allegations of fraud."  Romani, 929 F.2d at
878 (citation omitted).  This means that the plaintiff must not
only allege the time, place, and content of the alleged
misrepresentations with specificity, but also the "factual
allegations that would support a reasonable inference that adverse
circumstances existed at the time of the offering, and were known
and deliberately or recklessly disregarded by defendants."  Id.
 Finally, this court has required plaintiffs who bring
their claims on information and belief to "set forth the source of
the information and the reasons for the belief."  Romani, 929 F.2d
at 878; see also New England Data Servs., 829 F.2d at 288; Hayduk,
775 F.2d at 444-45; Wayne Inv., Inc. v. Gulf Oil Corp., 739 F.2d
11, 13 (1st Cir. 1984).
 Our previous strict pleading requirements under Rule 9(b)
are, in our view, consistent with the PSLRA.  See Maldonado, 137
F.3d at 10 n.6.

B.  Pleading Required State of Mind: Characteristic Fact Patterns
 Where a plaintiff can recover money damages on proof that
a defendant acted with a particular state of mind, the PSLRA now
requires a complaint to "state with particularity facts giving rise
to a strong inference that the defendant acted with the required
state of mind."  15 U.S.C.  78u-4(b)(2).  The "required state of
mind" for liability under section 10(b) and Rule 10b-5 is referred
to as scienter, which the Supreme Court has defined as "a mental
state embracing intent to deceive, manipulate, or defraud."  Ernst
& Ernst v. Hochfelder, 425 U.S. 185, 193 n.12 (1976).
 The debate between the plaintiffs and the defendants is
largely over whether Congress intended to embody, as the SEC says,
the prior Second Circuit methods for proving scienter (i.e., by
showing motive and opportunity or evidence of reckless or conscious
behavior sufficient to raise a strong inference) or, as the
defendants say, to prohibit use of at least the motive and
opportunity method.  This focus of the parties is not surprising,
as there was much debate in Congress on these points.
 The plaintiffs and the SEC argue that the PSLRA does not
prohibit use of the Second Circuit's methods for proving scienter.  
They refer to the bill reported out of the Senate Committee on
Banking, Housing, and Urban Affairs, see S. 240, 104th Cong.  
104(b) (1995), reprinted in 141 Cong. Rec. S9222 (daily ed. June
28, 1995), and to the Senate Report, which states, in part, that:
   The Committee does not adopt a new and untested pleading
 standard that would generate additional litigation.  
 Instead, the Committee chose a uniform standard modeled
 upon the pleading standard of the Second Circuit. . . .
 [T]he Second Circuit requires that the plaintiff plead
 facts that give rise to a "strong inference" of
 defendant's fraudulent intent.  The Committee does not
 intend to codify the Second Circuit's caselaw
 interpreting this pleading standard, although courts may
 find this body of law instructive.

S. Res. 98, 104th Cong., at 15 (1995), reprinted in 1995
U.S.C.C.A.N. 679, 694 (footnotes omitted).  They also rely on the
comments of Senator Dodd, co-sponsor of the PSLRA, explaining that
Congress intended to codify the Second Circuit's "pleading
standards."  141 Cong. Rec. S17960 (daily ed. Dec. 5, 1995).  
Finally, they argue that their position is bolstered by the
Statement of Managers of the Securities Litigation Uniform
Standards Act of 1998, Pub. L. No. 105-353, 112 Stat. 3227, which
declared that "the managers again emphasize that the clear intent
in 1995 and our continuing intent in this legislation is that
neither the Reform Act nor [the Standards Act] in any way alters
the scienter standard in Federal securities fraud suits."  Joint
Explanatory Statement of the Committee of Conference, Conference
Report to Accompany S. 1260, H.R. Conf. Rep. No. 105-803 ("1998
Conf. Rep."), at 15 (1998).
 The defendants argue that allegations of the existence of
motive and opportunity to commit fraud (or simple recklessness) do
not satisfy the scienter requirement.  To support their view, they
note Congress' statement that "[t]he Conference Committee language
is based in part on the pleading standard of the Second Circuit,"
(emphasis added) and that "[b]ecause the Conference Committee
intends to strengthen existing pleading requirements, it does not
intend to codify the Second Circuit's case law interpreting this
pleading standard."  H.R. Conf. Rep. 104-369, at 41 (1995),
reprinted in 1995 U.S.C.C.A.N. 730, 740.  Defendants also rely
heavily on the footnote associated with this sentence, which
states: "For this reason, the Conference Report chose not to
include in the pleading standard certain language relating to
motive, opportunity, or recklessness."  Id. at 41 n.23, reprinted
in 1995 U.S.C.C.A.N. at 747.  Further, the defendants emphasize
that although the Senate Bill (S. 240) included an amendment that
would codify Second Circuit law, the Conference Committee
eliminated that amendment.  See Amend. 1485, S. 240, 104th Cong.,
1st Sess. (1995), 141 Cong. Rec. S9170 (daily ed. June 27, 1995).  
 Finally, the defendants place considerable weight on
Congress' decision to override President Clinton's veto, in light
of the President's statement that in the Act Congress "intended to
'strengthen' the existing pleading requirements of the Second
Circuit . . . [and] to erect a higher barrier to bringing suit than
any now existing[.]"  H.R. Doc. No. 104-150, 104th Cong., 1st Sess.
(1995), 141 Cong. Rec. H15214 (Dec. 20, 1995).  Counsel for
defendant FTP candidly admitted before the district court that the
legislative history standing alone could be read either way, but
argued that the President's veto -- based on his reading of the Act
as overruling the Second Circuit motive and opportunity test --
administered the coup de grace.  While the President's view of what
Congress meant has some informational value, we give that view
little weight: the real issue is what the intent was of the
Congress, not the President.  
 The legislative history is inconclusive on whether the
Act was meant to either embody or to reject the Second Circuit's
pleading standards.  As the Third Circuit has noted, "[t]he Reform
Act's legislative history on this point is ambiguous and even
contradictory."  In re Advanta Corp. Sec. Litig., 180 F.3d 525, 531
(3d Cir. 1999).  The history and text show no agreement to restrict
the types of evidence which may be used to show a strong inference
of scienter.  Indeed, it would be unusual for Congress to legislate
on what fact patterns could or could not prove fraud or scienter.  
At best, there appears to have been an agreement to disagree on the
issue of Second Circuit standards (other than the strong inference
standard), and perhaps, as is common, to leave such matters for
courts to resolve.  See, e.g., Burlington Indus., Inc. v. Ellerth,
118 S. Ct. 2257, 2264 (1998).
 From the words of the Act, certain conclusions can be
drawn.  First, Congress plainly contemplated that scienter could be
proven by inference, thus acknowledging the role of indirect and
circumstantial evidence.  See 15 U.S.C.  78u-4(b)(2) (requiring
that "the complaint . . . state with particularity facts giving
rise to a strong inference that the defendant acted with the
required state of mind") (emphasis added).  Second, the words of
the Act neither mandate nor prohibit the use of any particular
method to establish an inference of scienter.  Third, Congress has
effectively mandated a special standard for measuring whether
allegations of scienter survive a motion to dismiss.  While under
Rule 12(b)(6) all inferences must be drawn in plaintiffs' favor,
inferences of scienter do not survive if they are merely
reasonable, as is true when pleadings for other causes of action
are tested by motion to dismiss under Rule 12(b)(6).  See Conley v.
Gibson, 355 U.S. 41, 45-46 (1957).  Rather, inferences of scienter
survive a motion to dismiss only if they are both reasonable and
"strong" inferences.
 Indeed, the debate about adoption or rejection of prior
Second Circuit standards strikes us as somewhat beside the point.  
The categorization of patterns of facts as acceptable or
unacceptable to prove scienter or to prove fraud has never been the
approach this circuit has taken to securities fraud.  As stated in
Maldonado, 137 F.3d at 10 n.6, this court has never adopted the
Second Circuit test.  Instead we have analyzed the particular facts
alleged in each individual case to determine whether the
allegations were sufficient to support scienter.  See, e.g., Shaw
v. Digital Equip. Corp., 82 F.3d 1194, 1209 (1st Cir. 1996).  In
this, the approach of this circuit has been like that taken by the
Supreme Court as to the issue of materiality in Basic Inc. v.
Levinson, 485 U.S. 224 (1988).   
 This court has considered many different types of
evidence as relevant to show scienter.  Examples include: insider
trading (discussed below); divergence between internal reports and
external statements on the same subject (see Serabian  v. Amoskeag
Bank Shares, Inc., 24 F.3d 357, 361 (1st Cir. 1994)); closeness in
time of an allegedly fraudulent statement or omission and the later
disclosure of inconsistent information (see Shaw, 82 F.3d at 1224-
25); evidence of bribery by a top company official (see Greenstone
v. Cambex Corp., 975 F.2d 22, 26 (1st Cir. 1992)); existence of an
ancillary lawsuit charging fraud by a company and the company's
quick settlement of that suit (see id.); disregard of the most
current factual information before making statements (see Glassman
v. Computervision Corp., 90 F.3d 617, 627 (1st Cir. 1996));
disclosure of accrual basis information in a way which could only
be understood by a sophisticated person with a high degree of
accounting skill (see Holmes v. Bateson, 583 F.2d 542, 552 (1st
Cir. 1978)); the personal interest of certain directors in not
informing disinterested directors of impending sale of stock (see
Estate of Soler v. Rodrguez, 63 F.3d 45, 54 (1st Cir. 1995)); and
the self-interested motivation of defendants in the form of saving
their salaries or jobs (see Serabian, 24 F.3d at 368).  While a
number of these cases could be thought of as falling into motive
and opportunity patterns, this court continues to prefer a more
fact-specific inquiry.  See, e.g., Glassman, 90 F.3d at 624 (fact
that lead underwriter may have had incentive to inflate the
offering price was significant, but overall, complaint failed to
state a claim on which relief could be granted).
 The most salient feature of the PSLRA is that whatever
the characteristic pattern of the facts alleged, those facts must
now present a strong inference of scienter.  A mere reasonable
inference is insufficient to survive a motion to dismiss.  Our pre-
Act case law had used both the language of "strong" inference and
of "reasonable" inference in various contexts.  For example,
"strong inference" is used in Maldonado, 137 F.3d at 9 and Suna v.
Bailey Corp., 107 F.3d 64, 68 (1st Cir. 1997).  "Reasonable
inference" language was used in Gross v. Summa Four Inc., 93 F.3d
987, 996 (1st Cir. 1996); Shaw, 82 F.3d at 1224; Serabian, 24 F.3d
at 368; Greenstone, 975 F.2d at 25; and Romani, 929 F.2d at 878.  
It is clear that scienter allegations now must be judged under the
"strong inference" standard at the motion to dismiss stage.
 Our view of the Act is thus close to that articulated by
the Sixth Circuit.  That court held that a plaintiff could survive
a motion to dismiss by "pleading facts that give rise to a strong
inference of [scienter]."  In re Comshare, Inc. Sec. Litig., 183
F.3d 542, 550 (6th Cir. 1999) (internal quotation marks omitted).  
The Sixth Circuit found that evidence of motive and opportunity to
commit fraud did not, of itself, constitute scienter for purposes
of section 10(b) and Rule 10b-5.  See id. at 551.  "Indeed, those
courts addressing motive and opportunity in Securities Act cases
have held only that facts showing a motive and opportunity may
adequately allege scienter, not that the existence of motive and
opportunity may support, as scienter itself, liability under  10b
or Rule 10b-5."  Id.  The court held that evidence of motive and
opportunity was "relevant" to pleading facts that could establish
scienter, and, on occasion, could "rise to the level of creating a
strong inference of reckless or knowing conduct."  Id.  
Nevertheless, such evidence, standing alone, could not "constitute
the pleading of a strong inference of scienter."  Id.; accord
Bryant v. Avado Brands, Inc., No. 98-9253, 1999 WL 688050, at *8
(11th Cir. Sept. 3, 1999).
 Without adopting any pleading litany of motive and
opportunity, we reject defendants' argument that facts showing
motive and opportunity can never be enough to permit the drawing of
a strong inference of scienter.  But, as we cautioned in Maldonado,
137 F.3d at 10 n.6, merely pleading motive and opportunity,
regardless of the strength of the inferences to be drawn of
scienter, is not enough.  Three circuits have interpreted the PSLRA
as permitting use of motive and opportunity type pleading if it
raises a strong inference.  See In re Advanta Corp. Sec. Litig.,
180 F.3d 525, 534-35 (3d Cir. 1999); Press v. Chemical Inv. Servs.
Corp., 166 F.3d 529, 537-38 (2d Cir. 1999); Williams v. WMX Techs.,
Inc., 112 F.3d 175, 178 (5th Cir. 1997) (dicta).  Like the Third
Circuit, we caution that "catch-all allegations that defendants
stood to benefit from wrongdoing and had the opportunity to
implement a fraudulent scheme are [not] sufficient."  In re Advanta
Corp., 180 F.3d at 535.
 Similarly, the PSLRA neither prohibits nor endorses the
pleading of insider trading as evidence of scienter, but requires
that the evidence meet the "strong inference" standard.  Unusual
trading or trading at suspicious times or in suspicious amounts by
corporate insiders has long been recognized as probative of
scienter.  See Shaw, 82 F.3d at 1204; Rubinstein v. Collins, 20
F.3d 160, 169-70 (5th Cir. 1994); Greenstone, 975 F.2d at 26.  The
vitality of the inference to be drawn depends on the facts, and can
range from marginal, see Shaw, 82 F.3d at 1204, to strong, see
Rubinstein, 20 F.3d at 169-70.  This continues to be true in
litigation after the effective date of the PSLRA.  Indeed, in
Greenstone we noted, and still think today, that allegations of
unusual insider trading by a defendant with access to material non-
public information can support a strong inference of scienter.  See
Greenstone, 975 F.2d at 26.  We similarly caution that mere
pleading of insider trading, without regard to either context or
the strength of the inferences to be drawn, is not enough.  See
Maldonado, 137 F.3d at 9-10.  At a minimum, the trading must be in
a context where defendants have incentives to withhold material,
non-public information, and it must be unusual, well beyond the
normal patterns of trading by those defendants.
C.  Substantive Scienter Standards
 The parties disagree about the effect, if any, of the
PSLRA on the substantive standard for proving scienter.  We start
with the state of the law in this circuit before the enactment of
the PSLRA.
 The Supreme Court has defined scienter as "a mental state
embracing intent to deceive, manipulate, or defraud."  Ernst &
Ernst v. Hochfelder, 425 U.S. 185, 193 n.12 (1976).  The Court
explicitly reserved the issue of whether recklessness sufficed,
saying "[i]n certain areas of the law recklessness is considered to  
be a form of intentional conduct for purposes of imposing liability
for some act."  Id.  Before enactment of the PSLRA, most circuits
had held that scienter in civil securities fraud actions could be
shown by showing recklessness.  It is accepted that recklessness
may establish intent to defraud in criminal prosecutions under  
17(a)(1) of the Exchange Act and under the mail and wire fraud
statutes.  See 8 L. Loss and J. Seligman, Securities Regulation
3656-57 (3d ed. 1991).  The question became whether the standard
for criminal liability should also apply to civil liability.  That,
in turn, raised the question of what was meant by recklessness.
 We have used a definition of recklessness articulated by
the Seventh Circuit:
   [R]eckless conduct may be defined as a highly
 unreasonable omission, involving not merely simple, or
 even inexcusable, negligence, but an extreme departure
 from the standards of ordinary care, and which presents
 a danger of misleading buyers or sellers that is either
 known to the defendant or is so obvious the actor must
 have been aware of it.

Sundstrand Corp. v. Sun Chem. Corp., 553 F.2d 1033, 1045 (7th Cir.
1977) (quoting Franke v. Midwestern Okla. Dev. Auth., 428 F. Supp.
719, 725 (W.D. Okla. 1976)).  Without at first explicitly adopting
that standard, this court assumed that it applied and cited it with
approval in Cook v. Avien, Inc., 573 F.2d 685, 692 (1st Cir. 1978).  
In Hoffman v. Estabrook & Co., 587 F.2d 509, 515-16 (1st Cir.
1978), this court again assumed that recklessness could ground a
Rule 10b-5 action and, again, quoted with approval a Seventh
Circuit definition:
     In view of the Supreme Court's analysis in
 Hochfelder of the statutory scheme of implied private
 remedies and express remedies, the definition of
 "reckless behavior" should not be a liberal one lest any
 discernible distinction between "scienter" and
 "negligence" be obliterated for these purposes.  We
 believe "reckless" in these circumstances comes closer to
 being a lesser form of intent than merely a greater
 degree of ordinary negligence.  We perceive it to be not
 just a difference in degree, but also in kind.
  
Sanders v. John Nuveen & Co., 554 F.2d 790, 793 (7th Cir. 1977).  
This court explicitly rejected a formulation of recklessness as
mere negligence, finding it had to come closer to being a lesser
form of intent than merely a greater degree of ordinary negligence.  
See Hoffman, 587 F.2d at 516 & n.10.  
 In Serabian this court held that it was error to dismiss
a securities fraud complaint that alleged sufficient facts to draw
"an inference that the [defendant] knew, or should have known, that
its public statements were inconsistent with the actual conditions
then being reported to [it]."  Serabian, 24 F.3d at 365 (emphasis
added and original emphasis omitted).  We understand Serabian to
have used "should have known" in the reckless disregard sense used
in Cook and Hoffman.  This court has explicitly tested factual
allegations to see whether they supported an inference that
defendants acted with reckless disregard.  See Romani, 929 F.2d at
878.  Since then, there have been encapsulated references to this
rule in dicta in other cases.  See, e.g., Maldonado, 137 F.3d at 9
n.4.  The rule in this circuit has been to accept recklessness, as
narrowly defined in the two Seventh Circuit cases (Sundstrand and
Sanders), as a method of proving scienter.  See Serabian, 24 F.3d
at 365.  That definition of recklessness does not encompass
ordinary negligence and is closer to a lesser form of intent.  
 The effect of the PSLRA on the standard for scienter has
been much disputed.  The Act itself is silent on the general
scienter requirements for 10b-5 actions, referring only to scienter
as "the required state of mind."  15 U.S.C.  78u-4(b)(2).   
Plaintiffs and the SEC maintain that the PSLRA did not intend or
purport to change whatever the preexisting standard was, and that
standard included some form of recklessness.  The defendants say
that only the most heightened recklessness standard should be used,
and that the SEC's views are not entitled to any weight.
 The circuit courts have reached different results.  A
panel in the Ninth Circuit has held that the PSLRA elevated the
standard to one of "deliberate recklessness," In re Silicon
Graphics Inc. Sec. Litig., 183 F.3d 970, 974 (9th Cir.  1999).  One
district court within this circuit has concluded that recklessness
is insufficient and that only conscious conduct would suffice under
the Act.  See Friedberg v. Discreet Logic Inc., 959 F. Supp. 42, 48
(D. Mass. 1997).
 In contrast, the Sixth Circuit has concluded that the
PSLRA did not alter the state of mind requirement and thus a
complaint pleading facts that give rise to a "'strong inference of
recklessness' of the kind required for securities fraud liability"
suffices.  In re Comshare, Inc. Sec. Litig., 183 F.3d 542, 552-53
(6th Cir. 1999).  The Sixth Circuit had previously adopted, as had
this circuit, the Sundstrand definition of recklessness, see id. at
550, and concluded that same standard applied after the PSLRA was
enacted.  The Eleventh Circuit has expressed its "basic agreement"
with the Sixth Circuit, Bryant v. Avado Brands, Inc., No. 98-9253,
1999 WL 688050, at *8 (11th Cir. Sept. 3, 1999), holding that the
PSLRA did not "substantively change the actionable level of
scienter," id. at *10.  The Third Circuit has concluded that
"[a]lthough the Reform Act established a uniform pleading standard,
it did not purport to alter the substantive contours of scienter,"
In re Advanta Corp. Sec. Litig., 180 F.3d 525, 534 (3d Cir. 1999),
and reiterated its prior law that recklessness, as defined in
Sundstrand, suffices, see id.  Without much discussion of the
issue, the Second Circuit has adhered to its previous acceptance of
recklessness.  See Press v. Chemical Inv. Servs. Corp., 166 F.3d
529, 537-38 (2d Cir. 1999).  The Fourth Circuit has also concluded
that the PSLRA did not change the pre-existing scienter standard.  
See Phillips v. LCI Int'l, Inc., No. 98-2572, 1999 WL 717253, at
*11 (4th Cir. Sept. 15, 1999) ("[T]o establish scienter, a
plaintiff must still prove that the defendant acted intentionally,
which may perhaps be shown by recklessness.").  Two district courts
in this circuit have reached the conclusion that some form of
recklessness is available.  See In re PLC Sys., Inc. Sec. Litig.,
41 F.Supp.2d 106, 115 (D. Mass 1999); Lirette v. Shiva Corp., 27
F.Supp.2d 268, 282 (D. Mass. 1998).
 We agree with those courts that hold that the PSLRA did
not address the substantive definition of scienter.  The
legislative history shows no such intent and the language of the
Act itself does not address the topic.  See generally Dunn, Note,
Pleading Scienter After the Private Securities Litigation Reform
Act, 84 Cornell L. Rev. 193 (1998).  The opinions of the Sixth and
Third Circuits discuss these points ably and there is no reason to
repeat the discussion here.  
 We add additional reasons that buttress this conclusion.  
The PSLRA does in fact discuss the role of "knowing" violations,
and thus an aspect of scienter, in two different respects.  The
first concerns contribution; the second, "safe harbors" for
defendants.  As to contribution, the Act, through a new  21D(g),
added a section "to preserve joint and several liability for
persons who knowingly commit securities fraud, but otherwise to
proportionately limit liability to the 'portion of the judgment
that corresponds to the percentage of responsibility of that
covered person.'"  10 Loss & Seligman, at 4687 (quoting 15 U.S.C.
78u-4(f)(2)(B)(i)).  The PSLRA specifies that:
   [a]ny covered person against whom a final judgment is
 entered in a private action shall be liable for damages
 jointly and severally only if the trier of fact
 specifically determines that such covered person
 knowingly committed a violation of the securities laws.

15 U.S.C.  78u-4(f)(2)(A).  In turn "knowingly commits a violation
of the securities laws" is defined (for 10b-5 purposes) as
requiring "actual knowledge" that a representation is false or an
omission renders a representation false.  Id.  78u-4(f)(10)(A).  
The definition specifically excludes "reckless conduct" as a basis
for construing a knowing commission of a violation.  Id.  78-
u(f)(10)(B).
 These special contribution provisions lead to several
conclusions.  Congress, having explicitly eliminated recklessness
as a basis for imposing joint and several liability, should not be
taken as implicitly having eliminated recklessness as a basis for
any liability.  See In re Silicon Graphics, 183 F.3d at 995
(Browning, J., concurring in part and dissenting in part).  Because
joint and several liability is more onerous than individual
liability, the exclusion of recklessness as the basis for imposing
joint and several liability constitutes a recognition that some
form of recklessness may suffice for individual liability.  
Furthermore, Congress took great care to insure that the actual
knowledge requirement was restricted to the joint and several
liability provisions of the Act.  Section 78u-4(f)(1) provides that
"nothing in this subsection shall be construed to create, affect,
or in any manner modify, the standard for liability associated with
any action arising under the securities laws."  15 U.S.C.  78-
u(f)(1).  Including this language would not make sense if Congress
had altered the general scienter requirement to restrict it to
actual knowledge.
 The "safe harbor" provisions of the Act similarly
buttress the conclusion that the Act did not alter pre-existing law
defining scienter.  The PSLRA adopted a statutory "safe harbor" by
adding a new section 27A to the 1933 Act, 15 U.S.C.  77z-2, and a
new section 21E to the 1934 Act, 15 U.S.C.  78u-5.  The safe
harbor has two alternative inlets: the first shelters forward-
looking statements that are accompanied by meaningful cautionary
statements.  See 15 U.S.C.  78u-5(c)(1)(A)(i).  The second inlet
is of importance here.  It focuses on the state of mind of the
defendant and precludes liability for a forward-looking statement
unless the maker of the statement had actual knowledge it was false
or misleading.  See  78u-5(c)(1)(B); H.R. Conf. Rep. No. 104-369
(1995), reprinted in 1995 U.S.C.C.A.N. 730, 743.  Again, this new
section 21E to the 1934 Act is explicit, in contrast with the lack
of such language in the definition of scienter in  21D(b)(2).  See
Bryant, 1999 WL 688050, at *10; In re Silicon Graphics, 183 F.3d at
995 (Browning, J., concurring in part and dissenting in part).
 Concluding that the Act does not alter the pre-existing
definition of scienter adopted by this circuit, we accordingly test
the complaint against that definition.
                               V
      Application of Standards to Plaintiffs' Complaint
 We review the dismissal of plaintiffs' complaint de novo,
giving plaintiffs the benefit of all reasonable inferences, but
holding plaintiffs to the standard of showing a strong inference of
scienter.  See Gross v. Summa Four, Inc., 93 F.3d 987, 991 (1st
Cir. 1996).  We think the claims are either insufficiently
particularized or, where particularized, do not permit a strong
inference of scienter.
 At the heart of plaintiffs' case is the allegation that
defendants consistently overstated the earnings of the company by
improperly booking as revenue (and inadequately reserving) "sales"
that were actually contingent transactions.  This was improper,
plaintiffs say, under generally accepted accounting principles
("GAAP"), specifically Statement of Financial Accounting Standards
No. 48 ("FAS 48").  Plaintiffs claim that the sales were contingent
because there were unlimited return rights.  Plaintiffs say that
they have evidence both tending directly to show conscious
wrongdoing on the part of defendants and circumstantial evidence
from which such wrongdoing may be inferred, including that the
defendants had both motive and opportunity.
A.  Direct Evidence of Scienter
 Two types of allegations tend to show conscious
wrongdoing: the "white-out" and the warehousing allegations.
1.  The "White-Out" Allegations and the Rule 56(f) Motion
 The "white-out" allegations claimed that FTP personnel
"whited out" (in a manner undetectable to company auditors) the
customers' additions to standard purchase orders; those additions
made orders contingent on the customers' unlimited right to return
the goods to FTP.  The white-out allegations were powerful, as the
district court recognized in initially denying the motion to
dismiss.  If adequately supported, claims that management
deliberately altered company records to hide material information
from company auditors could well create strong inferences of
scienter.  But, as the district court correctly ruled on summary
judgment, plaintiffs could not produce admissible evidence to
support the white-out allegations, and so we disregard these
allegations.
2. The Warehousing Allegations
 The warehousing allegations remain.  In essence, the
complaint asserts that at some time before the Class Period, the
company made a phony sale or sales and caused to be booked as goods
sold certain product that was shipped to a warehouse and not to
customers; the company then recognized the revenue from such phony
sales.  After a period, the product was sent back from the
warehouse as "returned" goods.  The allegations state that Robert
Casa, an employee who refused to sign for the "returned" product
and complained about the practice, was fired.  If true, such
practices by a company are very serious.  See United States v.
Bradstreet, 135 F.3d 46, 48 (1st Cir. 1998) (affirming a criminal
conviction for, inter alia, "knowingly falsifying [a company's]
books and records in an attempt to conceal [securities] fraud").
 The complaint is deficient in not identifying when this
took place.  The complaint is specific only in saying this occurred
before the Class Period.  The complaint alleges, on information and
belief, that the practice continued into the Class Period but
provides no specifics about why the practice is thought to have
occurred during the Class Period or why it caused harm to
plaintiffs.  The defendants say the temporal lag means the
allegations are irrelevant and should be disregarded.  The
allegations are not irrelevant -- evidence of past practice may
indeed be probative of present practice.  But there is scant else
from which to infer that this was the company's practice at any
pertinent time, and the allegations are not enough to support a
strong inference of scienter.  See Lefkowitz v. Smith Barney,
Harris Upham & Co., 804 F.2d 154, 155-56 (1st Cir. 1986).
B. Indirect Evidence of Scienter
 There is also indirect evidence from which plaintiffs say
scienter can be inferred.  Defendants, or so the complaint alleges,
knew the company was in trouble because they knew that Microsoft
would have, as an integral part of its Windows 95 package, a
product that would compete with FTP's wares.  Purchasers of Windows
95 would therefore have no reason to purchase FTP's product. Before
and during the Class Period (July 14, 1995, to January 3, 1996),
FTP engineers repeatedly warned management of this competitive
threat.   Indeed, certain large orders, such as a $10 million order
by the French Post Office, were cancelled.  Plaintiffs allege that
FTP's management responded through two strategies, "channel
stuffing" and contingent sales, which artificially inflated the
company's revenues.
1. Channel Stuffing
 "Channel stuffing" means inducing purchasers to increase
substantially their purchases before they would, in the normal
course, otherwise purchase products from the company.  It has the
result of shifting earnings into earlier quarters, quite likely to
the detriment of earnings in later quarters.  There is nothing
inherently improper in pressing for sales to be made earlier than
in the normal course, and we do not understand plaintiffs'
complaint to make any such claim.  Plaintiffs make use of the
channel stuffing allegations in a different way.  They say evidence
of channel stuffing supports their contention that management knew
that revenues during the Class Period would be low and attempted to
hide that fact by shifting income through channel stuffing (which
remained undisclosed) and by artificially inflating income through
improper revenue recognition.  In this context, the channel
stuffing evidence has some probative value.  But that value is
weak.  Unlike altering company documents, there may be any number
of legitimate reasons for attempting to achieve sales earlier.  
Thus, it does not support a strong inference of scienter.
2.  Contingent Sales
 Plaintiffs allege that the financial statements included
in FTP's Form 10-Q report for the third quarter of 1995 were
prepared in violation of GAAP and contained improperly inflated
revenues and earnings.  Specifically, plaintiffs claim that FTP
recognized revenues from sales that included a right of return,
which did not meet the requirements for revenue recognition set
forth in FAS 48.  When a buyer has the right to return a product,
FAS 48 prohibits the seller from recognizing income from the sale
unless six conditions are met.  See Statement of Financial
Accounting Standards No. 48,  6 (Fin. Accounting Standards Bd.,
June 1981).   
 Plaintiffs focus on three of the six FAS 48 conditions:  
that the buyer's obligation to pay the seller is not contingent on
resale of the product; that the seller does not have significant
obligations for future performance directly to bring about resale
of the product by the buyer; and that the amount of future returns
can be reasonably estimated.  See id.  If any of the conditions are
not met at the time of the sale, sales revenue cannot be
immediately recognized.  See id.
 Plaintiffs allege that during the Class Period FTP
recorded as "sales" transactions including a right of return that
violated all three of the above conditions.  Plaintiffs claim FTP
"induc[ed] distributors to purchase more product than they needed
with the promise that they could return the product if it were
unsold . . . . [S]ubsequently, a material portion of these 'sales'
were either returned in the fourth fiscal quarter of 1995 or
remained with distributors, but were unpaid for."  Plaintiffs
contend that "[u]nder certain circumstances, the distributor could
defer payment until FTP's or its own sales force had booked a sale
to an ultimate customer for the products.  FTP, however, would not
receive payment until the distributor was in a position to book the
sale and ship the product and receive payment from the end user .
. . ."  Furthermore, "due to the constantly changing competitive
environment and the release of Microsoft's 'Windows '95', FTP had
no way to reasonably estimate returns."  Finally, even if all the
conditions for immediate revenue recognition are met, FAS 48
requires that the seller reduce sales revenue and cost of sales
reported in the income statement to reflect estimated returns.  See
id.  7.  Plaintiffs allege that FTP violated this by failing to
adequately reserve for returns.
 Violations of GAAP standards such as FAS 48 could provide
evidence of scienter.  See Malone v. Microdyne Corp., 26 F.3d 471,
478-79 (4th Cir. 1994).   To support even a reasonable inference of
scienter, however, the complaint must describe the violations with
sufficient particularity; "a general allegation that the practices
at issue resulted in a false report of company earnings is not a
sufficiently particular claim of misrepresentation."  Gross v.
Summa Four, Inc., 93 F.3d 987, 996 (1st Cir. 1996) (quoting
Serabian v. Amoskeag Bank Shares, Inc., 24 F.3d 357, 362 n.5 (1st
Cir. 1994)).  Here, as the district court correctly concluded, the
complaint clearly falls short.  The  allegations in the complaint
do not include such basic details as the approximate amount by
which revenues and earnings were overstated, see Gross, 93 F.3d at
996; the products involved in the contingent transactions, cf.
Malone, 26 F.3d at 476-77 (products that were "sold" with rights of
return specifically identified); the dates of any of the
transactions; or the identities of any of the customers or FTP
employees involved in the transactions.  We do not say that each of
these particulars must appear in a complaint, but their complete
absence in this case is indicative of the excessive generality of
these allegations.
 As part of their opposition to defendants' renewed motion
to dismiss, plaintiffs attempted to introduce evidence of four
alleged contingent transactions drawn from defendants' automatic
disclosure.  The district court, however, refused to take this new
evidence into consideration in its ruling.  The court reasoned that
there would have been no disclosure but for the white-out
allegations, because the complaint would have been dismissed at the
outset; the white-out allegations proved insubstantial, even with
the benefit of disclosure; and therefore the remainder of the
complaint should be judged without the additional evidence obtained
through disclosure.  We need not decide whether the district
court's refusal to consider the additional evidence was correct,
because we believe that plaintiffs' additional evidence would not
have sufficed to prevent dismissal.
 Plaintiffs identify four sets of transactions from the
third quarter of 1995 that allegedly involve improperly booked
revenue.  Plaintiffs present invoices, purchase orders, and other
documentation that show, they contend: (a) a set of transactions
totaling $678,000 with a distributor, Merisel, in which Merisel was
not obliged to pay for the product; (b) a $705,250 transaction with
reseller CC-OPS in which CC-OPS was given an unlimited right to
return the product; (c) a $1.14 million transaction with reseller
Afina Sistemas that involved the "sale" of an FTP product that did
not yet exist; and (d) a $416,325 transaction with reseller Force
3 that was contingent upon Force 3 receiving a government contract.
a. The Merisel Transactions
 The Merisel allegations involve one $130,078 transaction
in August 1995 and two transactions in late September 1995 totaling
$548,192.  Plaintiffs claim that the August transaction, for which
FTP issued an invoice, was not a true sale but a "stock rotation,"
in which FTP replaced outdated products in Merisel's inventory at
no charge.  Plaintiffs point to a credit issued to Merisel by FTP
in mid-October for the full amount.  Less detail is provided
concerning the September transactions.  To support their contention
that those transactions were improperly booked contingent sales,
plaintiffs proffer three items: the $548,192 posted to accounts
receivable on September 29; the fact that $494,872 remained unpaid
as of December 31; and the agreement between Merisel and FTP, which
states that Merisel will pay FTP for all copies of FTP's products
sub-licensed by Merisel and its dealers.   
 A possible -- though far from necessary -- conclusion is
that the August transaction was an exchange of new products for old
improperly booked as a sale, as the original Merisel purchase order
contains the notation "[o]ffsetting order f. stockrotation" (sic).  
The September transactions, on the other hand, are described in
insufficient detail to support plaintiffs' allegations.  The mere
existence of an overdue receivable does not support an inference
that the original transaction was booked as a sale in violation of
GAAP.
b. The CC-OPS Transaction  
 The CC-OPS allegation concerns a September 29 order for
$705,250 of FTP products, which FTP immediately booked as a sale.  
A letter from FTP's sales director for the Americas apparently
accompanied the invoice.  The letter stated that it was FTP's
"policy" to "allow[] large or frequent customers to return product
without contingency within 60 days of receipt of order."  Large
customers were defined as those generating over $100,000 per year.  
A copy of the original letter is not present in the invoice file.  
On November 27, CC-OPS faxed a copy of the letter back to FTP, and
FTP extended the right of return from 60 to 90 days.  This revised
letter is present in the file.  Shortly after the return period was
lengthened, FTP issued a credit for the full amount of the invoice
and authorized the return of the product. On the original invoice
is written: "Credit per Jack Geraghty.  Not recognizable revenue."
 Plaintiffs charge that the initial booking of revenue
from this transaction violated GAAP; that the letter indicates that
FTP had a policy of granting unlimited return rights to its
customers; and that the absence of the original September 29 letter
from the file indicates that FTP was attempting to conceal the
existence of return rights.  However, FAS 48 permits sellers to
recognize sales that include a right of return, so long as the
required conditions are met and the seller establishes a reasonable
reserve for returns.  The granting of a right of return in a
particular transaction, or even a general policy of granting return
rights, does not per se mean that revenue cannot be recognized at
the time of sale.  Plaintiffs merely make an allegation that FTP
failed to adequately reserve and materially overstated FTP's
revenues.  Without any information on FTP's experience with past
return rates, the size of its reserve for returns, or how the
reserve changed over time, it is difficult to infer that FTP's
revenue recognition decisions were unreasonable enough to violate
GAAP, or that they give rise to a strong inference of scienter.   
"'Generally accepted accounting principles,' . . . tolerate a range
of 'reasonable' treatments, leaving the choice among alternatives
to management."  Thor Power Tool Co. v. Commissioner of Internal
Revenue, 439 U.S. 522, 544 (1979).
c. The Afina Sistemas Transaction
 The Afina Sistemas ("Afina") allegation involves two
purchase orders totaling $1.14 million issued on September 28.  The
orders were for 200,000 copies of FTP's Internet browser, custom
made for an Afina client.  FTP booked the entire amount as revenue
on September 29 and carried the amount as an account receivable
throughout the fourth quarter.  Plaintiffs claim that this revenue
was improperly booked because the version of the browser ordered by
Afina was then still under development.  An internal FTP document
indicates that the test version of the Spanish edition of the
browser was not scheduled to be completed until late October.  
Plaintiffs also point to notations reading "DO NOT SHIP PRODUCTS"
on documents attached to each invoice.
 This transaction is difficult to classify.  This appears
to be one part of a larger undertaking (the "Telefonica project"
referred to on the Afina purchase order) about which plaintiffs
present only fragmentary information.  It is not clear that the
custom version of FTP's browser referred to in Afina's purchase
order is the same as the Spanish version listed on FTP's
development schedule.  Furthermore, marking "DO NOT SHIP"
prominently on documents seems an odd way to conceal an improperly
booked sale from auditors.  Finally, the fact that an overseas
customer with 90 days to pay has not paid after 94 days is not
highly suspicious.  It is possible to infer, however -- at least
tentatively -- that this transaction should not have been booked as
a sale in September.  It is a leap from there to a strong inference
of scienter.
d. The Force 3 Transaction
 The Force 3 allegations concern a purchase order for
$416,325 issued on September 30, which stated on its face that it
was contingent on Force 3's receipt of a government contract.  FTP
nonetheless immediately recorded the entire amount as an account
receivable.  On December 29, FTP issued Force 3 a credit for the
full amount.  The same day, Force 3 sent FTP a new purchase order
for the same products it ordered on September 30, but this purchase
order did not refer to any contingency.  FTP issued a new invoice
and again booked the amount as a sale.  The original booking of
this sale in September appears to have violated the requirement in
FAS 48 that the buyer's obligation to pay the seller is not
contingent on resale of the product.   
 At best, plaintiffs' additional evidence supports an
inference that FTP improperly recognized from $416,000 to $1.55
million in revenue in the third quarter of 1995.  Because FTP
reported overall revenue during the quarter of $37.1 million, these
transactions do not support a strong inference of scienter.  It
is equally possible to conclude that FTP made some incorrect
accounting decisions regarding a limited number of transactions.  
Seeing fraud, however, requires too great of an inferential leap.  
In short, even when viewed in combination with plaintiffs' other
allegations, plaintiffs' additional evidence does not support a
strong inference of scienter, and thus the district court's
decision not to consider the evidence could not have affected the
outcome of the motion to dismiss.
3.  Insider Trading
 The allegations of insider trading do not, either alone
or together with the other allegations, suffice.  The individual
defendants sold FTP common stock during the Class Period.  For
example, Zirkle sold 40,000 shares on July 21, 1995 at a price of
$26.27 per share, for total proceeds of $1,050,800.  Goodnow sold
40,000 shares on July 27 at a price of $29.00 per share, for a
total price of $1,160,000.  Last, on August 2, 1995, Charlotte
Evans sold 200 shares at $28.50 per share, for a total of $57,000.  
All three defendants sold stock later in the Class Period as well.
 We first look at context.  The timing does not appear
very suspicious.  None of these three key players sold at the high
points of the stock price.  Each waited to sell until after FTP
announced a corporate reorganization on July 14, an announcement
which caused the price of the stock to fall.  Each sold some stock
before an allegedly manipulated analyst's report from Brookehill
Equities recommended FTP stock as a long-term buy on August 3,
1995, and before a favorable Cowen & Co. report on December 1,
1995.
 The total sum of sales involved -- over $23 million
during a six month period -- could be suspicious, but a closer look
provides ready explanations.  Goodnow, as plaintiffs allege,
retired on October 26, 1995, from his position as vice president,
CFO, and treasurer.  His sale of stock in July occurred not long
before he left the company.  He also sold a considerable number of
shares after he left the company -- 690,000 shares  accounting for
$19 million out of his total of almost $20.2 million in sales
during the Class Period.  The vast majority of the $23 million in
sales by the individual defendants, more than $20 million worth,
were by one individual who was leaving the company, and more than
$19 million was after that individual had left the company.  It is
not unusual for individuals leaving a company, like Goodnow, to
sell shares.  Indeed, they often have a limited period of time to
exercise their company stock options.  As to the others, the sales
do not reflect either unusual sales or sales made before a big
"event" unknown to the public.  Selling after delivering news that
causes a company's stock price to go down is not suggestive of
withholding information.  But that is what happened here.  
Plaintiffs provided no information on sales by corporate insiders
at times outside the Class Period, so there is no comparison point.  
 Although the total sum involved was large, the district
court correctly concluded that plaintiffs produced no evidence that
the trading was out of the ordinary or suspicious.  Absent
additional evidence, it is not possible to draw a strong inference
of scienter based on improper trading on material, non-public
information.  
C.  Other Alleged False Statements and Material Omissions
1.  Zirkle's Statements
 Zirkle's upbeat statements of optimism and puffing about
the company's prospects, described earlier, have each been reviewed
and we conclude that they are not actionable.  See Glassman, 90
F.3d at 635-36; Shaw, 82 F.3d at 1217-19.   
2.  Form 10-Q Report for Third Quarter 1995
 The 10-Q Report stated there was an increase in accounts
receivable and attributed it to increased sales.  Plaintiffs do not
say this statement was false; only that it was misleading because
it did not say the increased sales were subject to return rights.  
As an independent ground, this is too slight; as a ground in
service of the contingent sales/improper booking argument, it fails
for the same reasons that argument fails.
D.  Individual Defendants
 Because the dismissal of the complaint is upheld, we do
not reach the arguments of the individual defendants that the facts
alleged do not make out a claim against them.
E. Section 20(a) Claim
 Plaintiffs also assert claims against the individual
defendants under Section 20(a) of the Exchange Act, which provides
for derivative liability of persons who "control" others found to
be primarily liable under the Exchange Act.  See 15 U.S.C.  
78t(a).  Because plaintiffs' complaint does not adequately allege
an underlying violation of the securities laws, the district court
was correct to dismiss the Section 20(a) claim.  See Suna v. Bailey
Corp., 107 F.3d 64, 72 (1st Cir. 1997).
                              VI
 The district court correctly refused to dismiss the
complaint originally and was well within its discretion in limiting
the discovery it afforded.  The difficult and different balance the
Act now requires -- testing allegations before little or no
discovery, but holding plaintiffs to a strong inference of scienter
standard -- has been honored in this case.  Plaintiffs did not have
enough weight on their side of the balance to meet the requirements
of the Act, and so we affirm the dismissal.  Costs to appellants.

</body>

</html>